## THE J. E. TRUDEAU.

## NEW ORLEANS & A. PACKET CO. et al. v. PICKLES.

## PICKLES v. NEW ORLEANS & A. PACKET CO. et al.

### (Circuit Court of Appeals, Fifth Circuit.   January 16, 1893.)

### No. 51.

1. COLLISION—BOAT AT PIER—VIS MAJOR—EVIDENCE.
    A steamer descending the Mississippi, in trying to make a landing at the foot of Canal street, New Orleans, at 2:30 A. M., collided with and sunk a tug lying at her wharf. It was the custom of prudent navigators attempting to make a landing at that point to pass below it before turning towards the shore, in order to avoid a well-known and dangerous eddy. The steamer did not do so, and set up in defense the fact that she, without fault, had become unmanageable just before the collision by having her rudder clogged by some floating obstruction, the only evidence of which was the conflicting and uncertain testimony of the pilot, who made no complaint of any obstruction until after the collision. *Held*, that a case of vis major was not proved, and that the steamer was at fault. 48 Fed. Rep. 847, affirmed.

2. SAME—MEASURE OF DAMAGES.
    Although no fixed rule of depreciation from first cost can be adopted as a safe measure of the value of steamboats, and the appellate court considers a better method of valuation to be the expense of replacing the lost vessel, allowing about one third new for old, yet, where the trial judge in his opinion adopts a rule of 10 per cent. depreciation per annum, the amount of damages based thereon should not be increased on appeal.

3. ADMIRALTY—PLEADING—AMENDMENT.
    Where the libel for collision makes no prayer for interest on the amount awarded, such prayer may be made under admiralty rule 24, by an amended libel filed after all the issues except the amount of damages have been determined.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

In Admiralty. Libel by Thomas Pickles against the steamboat J. E. Trudeau, A. P. Trousdale, master, her tackle, etc. The New Orleans & Atchafalaya Packet Company, claimant and owner, intervened, and obtained a release on bond, of W. G. Coyle, R. W. Wilmot, and J. H. Menge, sureties. A decree was rendered for libelant. 48 Fed. Rep. 847. Both parties appeal. Affirmed.

J. P. Hornor and Guy M. Hornor, for New Orleans & A. Packet Co. James McConnell and Frank N. Butler, for Pickles.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge.   Thomas Pickles exhibited his libel in the district court of the United States for the eastern district of Louisiana against the steamboat J. E. Trudeau, A. P. Trousdale, master, her tackle, apparel, and furniture, and against all persons lawfully intervening for their interest in said vessel, in a cause of collision, civil and maritime; and his cause of action was fully set forth in the second and third articles of his libel, as follows:

"(2) That on the morning of the 30th day of January, 1890, at about the hour of 2:30 A. M., and while lying and moored at the wharf in this city at the foot of Canal street, on the Mississippi river, and was staunch and strong, and properly equipped to enable said tug to engage in the trade aforesaid, the said steamboat J. E. Trudeau, on her way from the upper coast and down the rivers Mississippi and Atchafalaya, in which said steamboat was then engaged, and while said steamboat was near the said tug, the said steamboat did run into your libelant's said tug with great violence and force, causing said tug to sink then and there; in consequence thereof said tug became a total loss to your libelant; and that the sinking of said tug was caused by want of care, skill, and diligence upon the part of the officers and crew of said steamboat J. E. Trudeau, and was solely due to the fault and negligence of the officers and crew of said steamboat.

"(3) That, by the sinking of said steam tug Josie, libelant has sustained a loss amounting to the sum of six thousand dollars."

The New Orleans & Atchafalaya Packet Company, claimant and owner of the said steamboat J. E. Trudeau, intervened, and obtained a release of the same on bond in the sum of $6,000, and thereupon filed its answer, the material part of which is as follows:

"That, as to the matters and things set forth in the second article of said libel, the same are not wholly true, as alleged, but the truth and fact is and was that on the morning of the 31st day of January, 1890, the said steamer J. E. Trudeau, being on a voyage to the city of New Orleans, in the Mississippi river, was descending said river and approaching New Orleans, as she usually did, on her regular weekly trips, and was approaching her landing just below Canal street, in the city of New Orleans, in her usual manner, and at a very ordinary rate of speed, and was duly manned and equipped, as required by law, with a sufficient crew and officers, a competent pilot and captain, the whole crew being on deck and on watch, and in their respective stations, when suddenly a log or some obstruction of that character got caught in the rudder of said steamboat J. E. Trudeau, and so blocked it that it became unmanageable, and the wheel could not be moved either one way or the other; that the pilot of the said steamboat immediately, upon perceiving this, rung the bell, and gave the order to stop and back said steamboat, and her engines were accordingly and immediately stopped and backed, but said steamboat was rendered uncontrollable by the accident to her rudder, as aforesaid, and was caught in the eddy which exists in the Mississippi river at and above the landing place of said steamer, and while said steamer was thus uncontrollable, by the effect of the force which she then had, and could not be checked, and by reason of said eddy, said steamboat J. E. Trudeau was unavoidably run upon said ferryboat Josie, and collided with her; that the said collision was the result of unavoidable and uncontrollable accident, which could not have been avoided by any act of the master or crew of said steamboat J. E. Trudeau, and that said accident was not caused by any want of care, skill, and diligence upon the part of the officers and crew of said steamboat J. E. Trudeau, but was solely due to said unavoidable accident; that all the machinery of said steamer J. E. Trudeau, including her steering gear, was in thorough good order, and she was provided with all the known appliances necessary for her own safety and for her proper navigation; that, as to the matters and things contained in the third article of said libel, claimant answers and says that the same are not true, and the damages alleged are greatly exaggerated."

After the taking of much evidence, the district court, on final hearing, adjudged the steamboat J. E. Trudeau in fault, and ordered a reference to the commissioner to report the damages. Thereafter the commissioner reported the amount of damages in the sum of $6,000. Opposition was made to the said commissioner's report as excessive, and praying that the amount found by the commissioner should be reduced to the sum of $1,680. Pending the hearing on the opposition

to the commissioner's report, the libelant, under a rule with notice, obtained leave from the court to file a supplemental libel, claiming interest at the rate of 5 per centum per annum from the time of the collision until paid, on whatsoever sum shall be allowed in the cause as the amount of loss sustained by libelant. On the same day the supplemental libel was allowed, the case came on to be heard on the report of the commissioner as to the damages sustained by libelant in the loss of the steam ferryboat Josie; and the court, considering the same, fixed the value of the steam ferryboat, at the date of her loss as aforesaid, at the sum of $3,950, and thereupon rendered judgment condemning the New Orleans & Atchafalaya Packet Company and W. G. Coyle, R. W. Wilmot, and J. H. Menge, as sureties on the release bond, in the sum of $3,950, with interest at the rate of 5 per centum per annum from the 31st of January, 1890, till paid, and costs of suit. From this decree claimant appealed to this court, assigning errors as follows:

"(1) That the judge of the district court erred in granting a new trial to the libelant after having decided the case on all its points in favor of the claimants.

"(2) That the judge of the said district court erred in sustaining the libel of libelant, and awarding damages against claimants.

"(3) That the judge of the district court erred in deciding that the weight of evidence showed that, opposite and above the point of landing which the Trudeau was endeavoring to make, there was a large and powerful eddy, well known to the navigators of the Mississippi river, and that the usual prudent course of descending boats, desiring to make a landing at this point, was to keep outside of the eddy, i. e. further towards the Algiers side of the eddy, a little below the point of landing, and then turn and proceed to the landing, out of the eddy, a little up stream.

"(4) That the judge of the district court erred in holding that there was a preponderance of testimony, and that the reasoning tended to show this mode of proceeding as being the safe and proper mode.

"(5) That the judge of the district court erred in holding that had the Trudeau kept outside of the eddy, and kept on to a point below Canal street, so that her turning would have been without the eddy, and her motion towards her landing would have been a little up stream, though her helm being incapable of governing the motion of the vessel, the vessel might nevertheless have been made simply by its revolutions to have prevented the Trudeau from running into the Josie.

"(6) That the judge of the district court erred in holding as a settled rule of law that in cases of collision it is the efficient controlling and management of the vessel charged with the fault which must be looked at; and that though her management at the very moment of, or for a few moments preceding, the collision, was faultless, nevertheless, if her anterior and controlling management contributed to the disaster, and was injudicious and lacking in skill or in observance of the known methods of navigation, either local or general, she is deemed to be in fault.

"(7) That the judge of the district court erred in refusing to grant to the claimants the new trial asked for by them.

"(8) That the judge of the district court, in finding the value of the steamer Josie, libelant's vessel, to be $3,950, erred; the evidence showing that it was not worth more than $1,250.

"(9) That the judge of the district court erred in allowing the libelant, without conditions, to amend his libel, after the final decision of the case, and all was over except the finding of the damages, by praying for interest on said damage, which libelant had neglected to do in his original libel; and said judge of the said district court also erred in allowing interest on the amount of damages allowed as prayed for in said amended libel.

"(10) That the judge of the district court erred in not holding that this was a case of inevitable accident, as he originally did, and in not dismissing the libel."

The libelant also appealed, and assigned as error that the preponderance of the evidence conclusively showed that the libelant was and is entitled to an allowance of at least $6,000 for the value of the steam ferryboat Josie, with interest thereon, as prayed for, and costs of suit.

The assignments of error need not be considered seriatim. The case made by the libel and the answer is that the ferryboat Josie was entirely without fault; the collision resulted from the action of the steamboat J. E. Trudeau; and the issues are (1) whether, just prior to the collision, and suddenly, a log or some obstruction of that character got caught in the rudder of the steamboat Trudeau, rendering her unmanageable, and, if so, whether at the time of, and just previous to, the collision, the steamboat Trudeau was without fault in her equipment and navigation, and the burden of proof is on the claimant; and (2) the value of the ferryboat Josie, the burden of proof being on the libelant. With regard to the obstruction of the rudder by reason of a log or drift being caught therein just prior to the collision, we are dependent entirely upon the evidence of the pilot, Alcide Leigh, no other witness having any knowledge of any obstruction, save by inference or hearsay, and the steamboat showing immediately afterwards no sign of any obstruction or of injury resulting therefrom. The sworn statements of Leigh are so conflicting one with another, and, when not conflicting, are so vague and uncertain, that we are unable to place reliance upon them. Exactly when and where and how he discovered that his rudder was obstructed is uncertain. The course of the Trudeau in approaching the landing just prior to the collision is uncertain; and, as to the obstruction itself, one answer sufficiently shows how confused he was on that important issue:

"Question. Now, Mr. Leigh, what was the reason that the boat refused to mind her helm? Answer. Well, the reason I cannot say. The exact reason I can't say. What the exact reason of it was I can't say. There was something the matter. Exactly what it was— I know there was something the matter with the helm. What it was I can't swear to, but I know I couldn't manage my helm around as far as I ought to. I could pull the wheel over as far as she ought to have gone. I couldn't bring her over to starboard."

Certain it is that although this witness claims in some parts of his evidence that, at the time he found the rudder was obstructed, he was out in the stream outside of the eddy, the ship straight down the river, headed for the shipyard on the opposite side, and although the master of the J. E. Trudeau stood by the pilot house observing the course of the boat, in conversation with the pilot as to the steering, and noticed the sheering of the boat and the backing of the engines, it was not until after the collision that he made any report or complaint of any obstructions of the rudder, or of any difficulty in the working of the steering apparatus, for the master testifies:

"I was running about right until we got pretty close to Canal street ferry, and I saw the boat was sheering towards the shore, and I said to the pilot, I said, 'Hold her out;' and he said, 'She is hard out, sir.' Question. You told him to hold her out? Answer. Yes. Q. And he said what? A. He said,

'She is hard out, sir.' Q. He said, 'She is hard out?' A. Yes, sir. Q. Who was the pilot? A. Mr. Leigh. Q. The same one that testified in this case before? A. Yes, sir. Q. What was his reply? A. 'I got her hard up.' That is the way his wheel was in the starboard, and it was impossible to put it right to starboard; and I noticed she didn't go, and I told him he had better stop her, and he said he had rung the backing bell. Q. Well, tell us what happened after that. A. Then I saw that the boat was backing, when, at the same time, she started to sheer in towards this side, and at that time her head struck the eddy, and she sheered more rapidly, and she came in under a strong backing bell into this ferryboat, and struck her; and as she backed out some twenty feet he stopped her, and I asked him what that meant,—how did that happen,—and he says, 'I can't move my rudders either one way or the other. They are foul.' "

The evidence shows that on the left bank of the Mississippi river, extending from some distance above and below the Canal street ferry landing, there is a strong, powerful eddy, well known to all steamboat men, which renders the landing of steamboats either above or below the Canal street ferry landing exceedingly difficult, requiring both skill and caution to avoid injury. The preponderance of evidence is that the proper and prudent course of navigation of a descending steamboat intending to make a landing in the eddy just below the Canal street ferry landing is to keep well in or near the middle of the river until opposite to or a little below the landing place intended, and then round to and come in to the landing on the eddy. The evidence shows that this course was not pursued by the Trudeau, but, instead, she came down near the left shore, not much, if any, outside of the eddy, until she reached near the Canal street ferry landing, at which point she undoubtedly struck the eddy, then sheered, and refused to answer her helm, and before her headway could be overcome, though backing at full speed, collided with the Josie. The evidence with regard to the course actually pursued by the Trudeau is conflicting, but we find several undisputed points which, in connection with the other evidence, make it clear to us that the above was the course followed. Joe Phillips, first witness called for libelant, testifies that he was a night watchman employed by the Mississippi Transportation Company, watching barges at Julia street, less than a half mile above the Canal street ferry landing, and on the night of the collision saw the J. E. Trudeau pass down, and that she passed close to the barges, and he estimates the distance out about 50 yards. Alcide Leigh, the pilot in charge, admits that he intended to pass the Josie at the Canal street ferry landing about 25 or 30 yards; and also that, at the time he discovered his rudder was unmanageable, he was about 100 yards above the ferry wharf, and about 60 yards out in the river; and there is no doubt that, almost immediately after the master noticed the boat was sheering towards the shore, the collision followed. We think it clear, under all the evidence in the case, that the J. E. Trudeau was in fault in her navigation, and that the claimed obstruction of her rudder by reason of a log or driftwood was an afterthought of the pilot. At all events, the claimant has failed to prove a case of vis major.

The claimant complains that after the finding of the district judge that the J. E. Trudeau was in fault, and all issues had been determined, except as to the value of the Josie, the district judge permit-

ted the libelant to file an amended libel praying for interest. We see no objections to the amendment of the libel under such circumstances. The practice in admiralty is very liberal in allowing amendments to facilitate justice, permitting them even on appeal, unless they present new causes of action. Admiralty Rule 24; The Charles Morgan, 115 U. S. 69, 5 Sup. Ct. Rep. 1172. In this case, however, the amendment operated no prejudice whatever to the claimant, because the libel prayed for $6,000 damages, and interest is in the nature of damages, and all that the court allowed in the case, principal and interest, could have been allowed without any amendment.

The evidence with regard to the value of the steam ferryboat Josie is of two sorts: (1) Opinions based on original cost, actual condition and merits at the time she was sunk, and the cost of replacing her; (2) calculations based on fixed percentages of depreciation per annum on her actual original cost. The opinions of witnesses, more or less informed, who do not resort to percentages of depreciation to ascertain the value, range from Capt. Trousdale's $1,000 to Capt. Kelly's $9,000, and really go very far to show that the Josie was actually worth $6,000. The rule adopted by insurance companies and steamboat appraisers is shown to be based on annual depreciation from cost price of from 10 to 20 per cent. Some apparently experienced steamboat men testified that a steamboat depreciates in value from 10 to 20 per cent. every year for from two to four years, and thereafter, if retained in service and kept in proper repair, does not materially depreciate. We are of opinion that no fixed rule of depreciation per annum can be adopted as a safe criterion of the value of steamboats. The kind and quality of material originally used, the care and use, state of repair maintained, are all essential matters to be considered. The district judge adopted a rule of 10 per cent. per annum depreciation, and found the value of the Josie at the time of her loss to be $3,950. If the present case were before us for original decision, we should be disposed to consider the evidence in all its aspects with a view to get at the expense of replacing the Josie, allowing about one third new for old, (the rule in general average;) but coming, as it does, on appeal, with the district judge's opinion, after having examined and considered all the evidence, and the general rule being not to increase damages on appeal, we are indisposed to increase the amount allowed in the district court. The decree of the district court is affirmed, with costs of this court and of appeal to be divided between appellants and cross appellant, and the costs of the district court to be paid by the New Orleans & Atchafalaya Packet Company.