**Petition of MARTIN.**
**THE MARS.**
**No. 295 of 1948.**

United States District Court
E. D. Pennsylvania.
Nov. 28, 1951.

Rawle & Henderson, Philadelphia, Pa., for petitioner.

Conlen, LaBrum & Beechwood, Philadelphia, Pa., for Delaware Power & Light Co.

GRIM, District Judge.

### Findings of Fact

A. In Respect to Limitation:

1. On February 20, 1948, at or about 4:13 A.M., Steamtug Mars collided with an obstruction about 100 feet off the cable pier of the Delaware Power and Light Company located on the west bank of the Delaware River at Pigeon Point, Delaware. At the same time, a break occurred in the cable power lines laid on the mud bottom in the area where the tug encountered the obstruction.

2. When the Delaware Power and Light Company, which owned and operated the electric power facilities of which these cables were a part undertook repair operations to restore service, it was found that one of the cables had been severed and others had been damaged in such a way as to suggest that they had been in contact with the keel of a vessel.

3. Delaware Power and Light Company has filed its libel in this district against the present petitioner in personam and against the tug in rem, demanding damages in the amount of $40,000 arising from the said accident.

4. Within six months after receiving notice of the claim, William H. Martin filed the present proceedings ·as owner of the tug for exemption from and limitation of his liability. An order was duly issued by this court to stay all pending suits, and referred the petition to a Commissioner for the purpose of receiving claims and ascertaining the value of the tug and her pending freight. The petitioner entered an ad interim stipulation and bond in the amount of $12,000.

5. The Delaware Power and Light Company has filed its claim in the limitation proceedings with a demand for damages in the amount of $40,000. The claimant has also filed its answer to the petition, denying the right of limitation by reason of the alleged privity and knowledge of the petitioner.

6. The Commissioner thereafter heard testimony and filed his report with the court fixing the value of the tug and her freight pending at the time of the accident in the sum of $15,198.50 with interest to run from the date of the accident. This finding has been confirmed by the court.

7. Testimony has been heard by this court on the issues raised by the petition and answer, and also on the claim presented by the Delaware Power and Light Company. No other claims were filed.

8. The pleadings did not dispute the ownership of the tug by William H. Martin. The evidence showed that he was the enrolled owner of the vessel from September 4, 1947, until he sold the tug on February 21, 1949. The certificate of inspection issued for the tug on September 23, 1947, which was in effect on the date of the accident, showed that William H. Martin was the registered owner. The vessel was operated and maintained by P. F. Martin, Inc., which collected all profits earned by her operation. Mr. Martin did not receive any express rental for the use of the tug, but it appeared that he was a stockholder in P. F. Martin, Inc., and served as its vice-president with nominal duties for which he received an annual compensation of $15,000. Under the pleadings and the evidence, the court finds that William

H. Martin was the owner of Tug Mars on the date of the accident.

9. Although the petitioner occasionally acted as "dispatcher" of tugs for P. F. Martin, Inc., he did not participate in the assignment of Tug Mars to the operation which she was performing at the time of the accident. .

10. The hull and engines of the tug were sound and in good operating condition at the time of the accident. Her steering controls and compass were in proper working order. She was furnished with charts and a ship-to-shore radio. There was no fathometer aboard, but it was not shown that this specialized type of equipment was required for her normal operations. She was fully equipped with fuel, stores and provisions for the trip from Philadelphia to Artificial Island and return. She carried her maximum number of duly qualified officers and crew, although her certificate of inspection did not require a full crew when the vessel was being navigated not more than 12 out of 24 hours in any one day, and the tug was not navigated for more than 8½ hours on each of the days she was employed on this trip. The court finds that The Mars was sound, staunch and strong, and properly manned, equipped and supplied for the voyage, and that she was fully seaworthy.

11. Tug Mars had docked carfloats at the Reading Company pier south of the claimant's cable pier on numerous occasions prior to the date of the accident without encountering any difficulty. Captain Osborne, who commanded The Mars on this trip, had taken other tugs on the same operation many times prior to this accident, and he was a duly licensed first class pilot and master of harbor tugs. The court finds that the operating company and its employees were not negligent in assigning Tug Mars to this operation under the command of Captain Osborne.

12. In the course of docking the carfloat at the pilings on the upriver side of the Reading Company pier, Captain Osborne had to change the position of the tug in order to hold the after end of the carfloat against the push of the flooding tide while her lines at that end were being secured. Due to the comparatively narrow space between the exposed side of the carfloat and the nearest portion of claimant's cable pier, which was only 147 feet distant from the pilings, the 99-foot tug maneuvered astern and was carried upriver to the point opposite the cable pier where the cables were laid on the mud bottom.

13. The facts of the accident as disclosed by the testimony fail to show that the petitioner, William H. Martin, was connected with the acts or conditions which brought it about, either in the sense of knowledge or authorization, or immediate control of them, or through any participation in them.

14. Even if the resulting contact with and damage to the cables occurred from Captain Osborne's negligent operation of the tug, such negligence on his part would not involve the privity and knowledge of the petitioner.

B. In Respect to Liability:

15. The tug and tow arrived at Pigeon Point about 4 A.M. on February 20, 1948. The weather was fair, it was still dark, and the tide had started on the flood, which resulted in the upriver current of approximately 3 miles an hour.

16. The tug was made fast to the starboard side of the carfloat, which was empty, at a position a little aft of amidship. The carfloat measured 250 feet in length by 34½ feet wide, and her draft at that time was 2 feet. The Tug Mars measured. 99 feet in length by 21 feet beam, and she had a draft of 11 feet.

17. The Reading Company pier where the tug intended to dock the carfloat was situated at a right angle with the shore line and ran out into the river a considerable distance. Pilings were located on the upriver side of the outer portion. The claimant's cable pier was 147 feet farther upriver from these pilings. The Reading Pier was about 30 feet longer that the cable pier.

18. When Captain Osborne made ready to dock the carfloat he was directed by the pier employee on duty to bring it alongside the pilings a few feet inside the outer end of the pier. The tug placed the carfloat

in the designated position, which placed the carfloat against the pilings on her port side and left a space of 112½ feet between the starboard side of the carfloat and the nearest side of the cable pier.

19. The tug brought the forward end of the carfloat near enough to the pilings so that a line could be secured at that end. The after end of the carfloat was not close enough to the pilings to make a line fast, or it had swung out with the tide, so that the tug was required to change her position from parallel to head-on at the stern. In the experienced judgment of Captain Osborne, the tug could not safely or properly expert the necessary maneuver from her position alongside the side of the carfloat. He therefore cast off his lines and backed out into the river to avoid swinging his vessel against the cable pier, which according to the measurements furnished by the claimant at the trial was directly alongside the tug at that time and hardly more than one length distant. Captain Osborne had carried out this maneuver prior to this time, and the court finds that his doing so under the circumstances disclosed by the evidence was a proper exercise of his discretion.

20. The tug backed at half speed with a hard left rudder in order to counteract the force of the tide as much as possible. Captain Osborne intended to go astern until he had reached a point about 150 feet away from the stern of the carfloat. The tide carried him upstream as he was backing at an angle of 45 degrees with the carfloat, so that he reached a point about 200 to 250 feet away from the carfloat and about 100 feet off the end of the cable pier when he felt some object catch in his propeller. He had crossed this stretch of water on previous occasions without difficulty and the soft mud bottom had not interfered with navigation. He observed the sign on the claimant's pier reading "Cable Crossing" but he did not know, nor did his navigational charts disclose, that any cables were laid on or close to the mud surface. Under these circumstances, the court finds that Captain Osborne was not at fault in continuing to back at half speed when he

found that he was farther from the carfloat than he had first intended to be.

21. The tug hit the power cables on February 20, 1948, at 4:13 A.M., at which time the automatic devices on the cable pier recorded a power failure due to a broken cable.

22. At the very instant the tug struck the then unknown object, James H. Kelly, who in the performance of his duties as mate was standing and observing on the forward deck, heard a bump or thud and felt a jar and at the same instant noticed an arcing from the top of the "Cable Crossing" sign on the cable pier.

23. Captain Osborne, at the time of the initial striking, was engaged in talking to the engineer and watching the engine while the engineer was working the throttle. The captain did not see the arcing from the top of the "Cable Crossing" sign, but as soon as the tug struck the cable he recognized the jolt as indicating that something had become lodged in the propeller. He stopped the engines at once, then worked them forward and backward for 10 to 20 minutes until he felt the obstruction come loose, and then completed tying up the carfloat.

24. The tug operated sluggishly during the rest of the trip. Captain Osborne concluded that something was still caught in the propeller and he arranged for the vessel to be hauled out of the water upon her return to Philadelphia. At that time it was found that a section of heavy meshed wires had become entangled in the propeller blades and the shaft. After this was removed, the tug operated normally.

25. Claimant power company began salvage operations on February 24, 1948, and on the same day its diver found an indentation or furrow in the river bed the shape of the hull of a vessel. It was about 50 feet long; its upper end was farther out from the Delaware shore than the lower end. The depth of this indentation was about 3½ feet below the surrounding bottom at its upstream end and somewhat less at its downstream end. The depth of the water outside the indentation was about

8 feet at its upper end and about 9 to 10 feet at its lower end from which point the water got deeper as one went downstream. The water was about 15 feet deep at the Reading Pier.

26. On that same day the diver discovered in the furrow the Delaware end of the severed No. 15 cable at a point 142 feet from the east face (river end) of the pier. A sounding taken at the approximate location that cable No. 15 was severed established that the depth of the water at the time of the initial striking was approximately 8 feet. That same day the diver located cable No. 16 (the last cable downstream) in the center of the bottom of the furrow. It was found to be damaged in two places. The damage to it appeared to have been caused by the bottom of a vessel sliding over it, for the armor wires and sheathing were flattened and damaged. A week later, March 3, 1948, the diver found the New Jersey end of the severed cable No. 15. This was at a position 300 feet out from the power company pier and 200 feet downstream. Both of the severed ends of cable No. 15 were badly twisted, matted and torn apart for a considerable distance.

27. The claimant electric company had laid 4 armored power cables across the Delaware River from Pigeon Point to Deepwater Point in 1930. At that time the United States Department of Engineers, as the governmental body authorized to license the laying of such cables across navigable channels, required that they be entrenched. These 4 cables were accordingly laid in a trench 10 feet deep, to avoid interference with contemplated dredging operations in the channel. The electric company did not limit the trench to the channel in midstream, but laid the cables in a trench all the way to the shore, which was approximately 1,000 feet away from the channel on the Pennsylvania side.

28. In 1947, the claimant electric company found it necessary to lay 8 additional power cables across the river. This was described by those involved in the installation as being "more or less an emergency operation," in which the time element was a decisive factor. It would take twice as long to entrench these cables as to place them on the surface of the mud bottom and it would cost three times as much. These cables, among which were the ones involved in the accident, were laid unentrenched on the mud bottom of the river.

29. According to the claimant's witnesses who participated in the discussions prior to laying the cables in 1947, very little if any consideration was given to the hazard of damage by vessels properly using the adjacent Reading Company Pier. They knew the measurements of the piers, the amount of traffic at the pier, and the depth of water and the nature of the bottom off the end of their cable pier. The only witness who recalled any discussion of this condition testified that it was believed that the mud bottom was hard enough to cause a vessel to go aground before reaching the cables, although it was expected that the cables would sink into the mud a foot or two by their own weight.

30. The bottom was described by claimant's witnesses as being "soft, alluvial mud" which was so unstable that their diver sank a foot into the bottom with each step and his iron probe would penetrate about 2 feet before meeting enough resistance for him to feel it in the dark. The furrow made by the keel of The Mars was described as being 3½ feet deep. As expected, the cables had buried themselves in this soft mud about 2 feet through their own weight. Under these circumstances, the court finds that the claimant's officers and their advisers either ignored the paramount rights of vessels using the open water beyond the cable pier, or that they misjudged the risk of damage to their cables when laid on the soft mud surface across the stretch of water which might reasonably be used by vessels coming and going from the Reading Pier.

31. The initial striking of the cables was not caused by any negligence in the operation of the tug.

32. The subsequent maneuvering of the tug backward and forward in the attempt to free it of the cable entangled in its propeller was not an act of negligence under the circumstances detailed above.

33. It would be impossible to ascertain from the evidence how much of the damage to the cables was caused by the non-negligent operation of the tug which resulted in the initial striking of the cables and how much of the damage was caused by the subsequent maneuvering to free the propeller of the cable, if the subsequent maneuvering had been found to constitute negligence and such allocation of damages were necessary.

### Discussion

■ The principal question in this case is whether the damage to claimant's cables was caused by the negligent operation of the Steamtug Mars. I have concluded that claimant has failed to prove by a preponderance of the evidence that the damage was caused by the negligence of the captain or those persons in charge of the tug.

■ The tug, while executing a simple, orthodox maneuver, struck the cables about 100 feet off the end of the Delaware Power and Light Company Pier. In 1930 the power company had laid 4 cables across the river in this same area and had entrenched them 10 feet under the river bottom. In 1947 the power company laid 8 additional cables unentrenched on the river bottom. It was several of these more recently laid unentrenched power cables which the tug struck and damaged. By virtue of a government permit the power company had a right to lay the more recent cables on the river bottom unentrenched, but in laying the cables in that manner it assumed the risk that vessels going to and from the Reading Company Pier might collide with the cables in the shallow water off the power company pier, which is a mere 147 feet from the pilings along the near side of the Reading Company Pier. See United States v. Henry Steers, Inc., D.C.N.Y.1934, 8 F.Supp. 363, 1934 A.M.C. 1001.

■ One of the engineers, a witness for the claimant power company, testified that the engineers participating in laying the cables in 1947 assumed that any vessel deviating from its course to and from the Reading Company Pier in the direction of the cable area would go aground before hitting the cables, since the river becomes gradually shallower as one travels north from the waters surrounding the Reading Company Pier to the waters surrounding the power company pier. The accident involved in the present case is conclusive proof that the engineers misjudged the actual risk created by laying unentrenched cables across the river. The power company itself is chargeable with the consequences of the misjudgment of its officers and agents and is itself responsible for the damage to the cables caused by an accident within the scope of the risk it assumed when it laid unentrenched cables in a heavily travelled area near a railroad pier. The right of a vessel to have navigable waters free from obstructions is paramount to the right of the owner of unentrenched cables lying beneath the surface. United States v. Henry Steers, Inc., supra. The initial striking of the cables, therefore, was clearly not the result of any negligence in the operation of the tug.

Claimant power company vigorously contends that after the tug had caught the cable in its wheel (propeller) it was grossly negligent in backing and filling in order to free itself of the obstruction and resume its operation. It argues that the tug captain should have known that the obstruction which fouled the wheel was a cable, since the tug at the time of the initial contact was directly in front of the well illuminated power company pier on which there was a large neon sign proclaiming "Cable Crossing" and in an area designated "Cable Area" on his charts and since the captain should have known of the electrical arcing above the "Cable Crossing" sign at the instant of the initial striking of the cables. It further contends that under these circumstances the subsequent maneuvering to free the wheel was an act of negligence.

■ It is true that the tug maneuvered for 10 or 15 minutes after it had struck the cable and that by so doing it probably damaged the cable much more than it would have damaged it if the tug had stopped immediately when it first ran into the cable. But I cannot decide that the tug company is liable for the damage which was done

to the cable subsequent to the initial striking, both because in my opinion the tug captain did only what a reasonable and prudent captain would have done under the circumstances to free the propeller from the obstruction in it,[1] and also because there is no way to determine how much of the damage to the cable was done by the initial striking thereof and how much of the damage was done by later maneuvering.

Conclusions of Law

A. In Respect to Limitation:

1. The court has jurisdiction of the parties and of the limitation proceeding.

2. The petitioner was the registered owner of Tug Mars at all material times. He is thereby entitled to petition for exemption from, and limitation of, his liability in this proceeding.

3. The petitioner is without privity or knowledge of this accident. Even if the operating manager of the vessel had participated in any way, which I have found not to be the case, the petitioner would not be bound by such participation under the express provisions of the Limitation of Liability Act, as amended, 46 U.S. C.A. § 183(a).

4. The petition for the right to limit liability to the amount fixed in this proceeding is hereby granted.

B. In Respect to Liability:

5. The court has jurisdiction to determine the merits of the claim presented by Delaware Power and Light Company.

6. Tug Mars was seaworthy at all material times, and was properly manned, equipped and supplied for the intended voyage. She was competent in all material respects for the performance of the work assigned to her.

7. The point where the accident occurred was open water with sufficient depth, in view of the soft mud bottom, to permit a vessel having the existing draft of Tug Mars to navigate. It was accordingly navigable water, and vessels had the paramount right to use it free from obstruction.

8. There was nothing to put the master of the tug on notice that the cables were not entrenched a safe distance below the soft mud surface of the bottom at that point. The sign reading "Cable Crossing" warned that cables existed in the vicinity, but did not imply their location in respect to the bottom. The master was justified in assuming that the cables were so located that they would not constitute an obstruction to the use of navigable water.

9. The navigation up to and including the time of the initial striking of the cables was reasonable and proper under the circumstances. The master was entitled to make use of all navigable water in the Delaware River opposite the cable pier. He was not negligent in continuing to back at half speed until he had sufficient distance to complete his docking operation, and he was not limited to any particular distance as long as he was in navigable water, where his vessel had paramount rights.

10. The permit granted by the proper governmental agency to the claimant corporation to lay its cables on the surface of the mud in 1947 did not alter the paramount rights of light-draft vessels such as Tug Mars to use the navigable water in the vicinity of the cable pier.

11. Claimant power company assumed the risk of the damage to the cables caused by the initial striking by the Tug Mars. See United States v. Henry Steers, Inc., D.C.S.D.N.Y.1934, 8 F.Supp. 363, 1934 A.M.C. 1001.

12. The subsequent maneuvering of the tug backward and forward in the attempt to free it of the cable entangled in its propeller was not an act of negligence under the circumstances.

13. It would be impossible to ascertain from the evidence how much of the damage to the cables was caused by the operation of the tug which resulted in the initial striking of the cables and how much of the damage was caused by the subsequent maneuvering to free the propeller of the cable.

14. Claimant has failed to prove by a preponderance of the evidence that the dam-

---

1. The captain testified that he thought that the obstruction was caused by a sunken log.

age to the cables was caused by the negligence of the captain and those in charge of the tug.

15. Petitioner and the Tug Mars are not liable to claimant.

16. A decree may be submitted granting the petition for limitation of liability, and entering judgment in favor of the petitioner on the claim filed by Delaware Power and Light Company, with costs upon the claimant.