ORANGE BEACH WATER, SEWER AND FIRE PROTECTION AUTHORITY, Plaintiff-Appellee,

v.

M/V ALVA, in rem, Barges, SP–3 and SP–4, in rem, Atlas Southern Corporation, McKenzie Services Company, et al., Defendants-Appellants.

No. 81–7458.

United States Court of Appeals, Eleventh Circuit.

July 22, 1982.

Charles J. Fleming, M. Kathleen Miller, Mobile, Ala., for defendants-appellants.

Alex F. Lankford, III, George M. Walker, Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, MERRITT * and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

This is a suit in admiralty, in personam and in rem, arising out of damage to the plaintiff's submarine water pipeline when it was struck by an unidentified vessel passing on the Gulf Intracoastal Waterway (the Waterway) near Mobile, Alabama. In its complaint the plaintiff, Orange Beach Water, Sewer and Fire Protection Authority (Orange Beach), charged the defendants (collectively, the ALVA) with obstruction of navigation in violation of 33 U.S.C. § 409 and applicable regulations by mooring the M/V ALVA and her tow at or near the pipeline crossing. The ALVA responded that the tug and tow did not obstruct navigation, and that Orange Beach was negligent in not complying with the permit issued by the United States Army Corps of Engineers, in failing to maintain the pipeline, and in not marking the location of the

---

* Honorable Gilbert S. Merritt, U. S. Circuit Judge for the Sixth Circuit, sitting by designation.

pipeline properly. In a bench trial, the district court found the ALVA liable and awarded damages. The ALVA appeals this adverse judgment.

The ALVA contends that the district court erred in applying the rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), which shifts the burden of proof on the issue of causation upon a showing of a statutory or regulatory violation, and, urges in the alternative that she met this burden. She further disputes the district court's finding of no contributory negligence on the part of Orange Beach, and in computing damages. We affirm in part, reverse in part and remand for further findings of fact.

In October 1974 Orange Beach completed construction of a fresh water pipeline buried under the Waterway at Mile 157.9, some seven miles east of Mobile Bay. The pipeline was constructed of ten-inch ductile iron pipe, in eighteen-foot sections connected by ball and socket joints. Installation was accomplished in compliance with a permit issued by the United States Army Corps of Engineers (Corps), number SAMOP–SP 74–231. Under the terms of the permit, Orange Beach is authorized to

> Install and maintain a 10-inch water line across the Gulf Intracoastal Waterway, Mile 157.9. Top of pipe will be no less than –19 ft. mean sea level. The trench will be excavated by dragline and the excess spoil not used for covering the pipe will be compacted in a spoil area on the adjacent bank. Work per attached plans (2 sheets).

Plaintiff's Exhibit 5. The plans contain a cross-sectional diagram depicting a 210-foot waterway with a flat bottom and a mean sea level depth of fifteen feet, and indicating a nineteen-foot depth from the mean sea level to the top of the pipeline beneath the waterway. The diagram has no indicated amount of cover for the pipeline in those stages at which it rises from the bottom of the waterway to the north and south banks. The permit further provides, in paragraph I.u.,

> That there shall be no unreasonable interference with navigation by the existence or use of the activity authorized herein.

A four-by-four foot sign on the south bank of the Waterway, facing in each navigational direction, contained the following notice to mariners:

DANGER

NO ANCHORAGE

PIPELINE CROSSING

U S C E

During the four and one-half year period from the 1974 installation to the 1979 allision, there was a great deal of erosion in the Waterway at and around the pipeline crossing, due mainly to wheel wash and wave action caused by passing traffic. Erosion was aggravated by some mariners' practice of tying off to trees on the south bank, destroying the trees and their roots' support of the bank. By March 1979, the banks had eroded to such an extent that the pipeline had become exposed at the points where it originally descended on both the north and the south banks. Orange Beach was aware of this condition for at least two years prior to the incident involved in this case.[1] The authority officials had discussed methods by which the problem could be remedied and had contacted the Corps about the erosion. At a meeting only 17 days prior to the incident, the board members agreed to seek bids for permanently correcting the problem. The minutes of

---

1. The district court made no specific finding as to when Orange Beach first learned of the necessity for repairs. Both the superintendent and the consulting engineer for Orange Beach knew of the erosion for at least two years before the present damage. Superintendent Ryan stated specifically, "I think we kicked that [it was going to be necessary to make some permanent new repair] around for a couple of years or more." 2 Rec. 76. This evidence was unqualified and uncontradicted.

this meeting report: "O. M. Ryan stated that our canal crossing had washed out the past four or five years to the point where it was vulnerable to being hit by a barge and immediate action should be taken." Def. Exh. 5.

At 11:20 p. m. on March 28, 1979, the 63-foot ALVA, pushing the empty barges SP–3 and SP–4, departed Pensacola, Florida for Houston, Texas. The barges, each 52½ feet wide and 298 feet long, were abreast in front of the tug, or "doubled up." The entire tow was some 105 feet wide. When small craft warnings were issued for Mobile Bay on March 29, 1979, at about 5:30 p. m., the ALVA moored very close to the pipeline crossing between five and twenty feet off the south bank. Although there was room to "single up" the barges, which would have taken about 45 minutes, this was neither discussed nor considered by the crew, and the barges remained moored abreast of one another. The ALVA could have moored further west, away from the pipeline. On March 30, 1979, the ALVA and tow were moved west to a point approximately 500 feet from the pipeline, where they remained all day. The next day the tug and tow tied off still further west at Mile 156.5 on the north bank, where the crew then singled up the barges.

The Waterway was between 275 and 300 feet wide at the pipeline crossing in March 1979. The project width of the channel, where a twelve foot depth is assured by the Corps, was 125 feet. Outside that channel there was a gradual rise on the south bank, while the north bank elevated more in the configuration of steps. The area is located on a straight stretch of the Waterway with a sharp bend to the west within one-half of a mile, and with a smaller bend to the east within the same distance.

At some time between 1:00 and 3:00 a. m. during the night on March 30, 1979, an unidentified westbound vessel struck the pipeline at a depth of eight to nine feet, between 25 and 50 feet off the north bank of the Waterway, resulting in a twelve-by-eighteen inch hole in more than one-third the circumference of the pipe. It is unknown whether the pipeline was exposed at the point of impact before the allision, or whether the force of the blow and the escape of pressurized water caused the pipe to become exposed at the time it was inspected during the daylight hours of March 30, 1979.

There was evidence that other flotillas were experiencing difficulty navigating in the area of the pipeline on the day it was struck, and before the ALVA moved to the north bank and singled up its barges. Neither party produced any evidence concerning the navigation of vessels passing in the night. We quote at length from the district court's detailed findings regarding the circumstances surrounding the ALVA's mooring:

> The Court is persuaded that the presence of the ALVA and her tow obstructed navigation by taking up over 40% of the entire bank-to-bank width of the Waterway, and by blocking off some portion of the 12 foot navigation channel. Vessels rounding the bends from either direction could pass, but only by steering to the north side of the Waterway at a point in time when they normally would be straightening out their tows and lining up for the next bend. Obviously, navigation in hours of darkness in close quarters could prove hazardous. The problem is heightened on those flotillas with two or three barges singled up because the tow could already be in the straightaway before the tug rounded the bend. While the obstruction *vel non* created by a moored tow in a waterway is a circumstantial fact question involving a case-by-case determination, this Court finds that considering the width of the navigation channel, the width of the tow, the proximity of the pipeline crossing, and the characteristics of the Waterway at that location that the ALVA and her tow obstructed navigation in violation of 33 U.S.C. § 409.

Applying the rule of *The Pennsylvania*, the district court further found:

> The defendants fail in their effort to demonstrate that their statutory fault could not have been the cause of the incident. The only witness produced on this point was Captain Sheffield, who testified that his opinion was that other vessels had plenty of room to pass the ALVA and her tow moored on the south side of the Waterway. Such opinion evidence is strongly contradicted by the linear width figures and other evidence such as the difficulty other boats and tows were having the same day of the striking navigating this particular pipeline area. While this testimony may suggest some negligence on the part of another vessel, it does not prove that the statutory fault of the ALVA and her tow could not have been the cause of the accident. And the fact that this pipeline was not struck in the four and a half years before the ALVA moored with her barges doubled up nor was it struck in the subsequent four months it remained in the same position after the incident, certainly indicates otherwise. The Court is not persuaded by the unsupported suggestion of negligence by a third party and concludes that the statutory fault of the defendants could have been the cause of the damage to the pipeline.

Turning to the ALVA's contention that the negligence of the unidentified vessel was a supervening cause of the damage to the pipeline, the district court first noted the absence of evidence as to the circumstances of the allision then found any such negligence to be a foreseeable intervening force, within the scope of the risk created by the ALVA.

It is undisputed that the pipeline was marked only by the sign on the south bank. There was no sign on the north bank. There was no buoy marking the exposed ends of the pipeline, or the portions thereof in the Waterway vulnerable to contact with a vessel having a nine foot draft, common for tugs and loaded tows in this section of the Waterway. No notice was filed warning vessels of the pipeline's location in the Waterway.

The district court's findings are silent as to the knowledge of Captain Sheffield or the crew of the ALVA on March 29, 1979, before the incident occurred, as to the depth of the pipeline at the edges of the Waterway, or whether the pipeline was exposed. Similarly, there are no findings as to whether a reasonable person aboard the ALVA would have noticed these facts under the conditions then existing, and appreciated the risk created by the selected mooring.

Orange Beach initially repaired the pipeline with a flexible clamp coupling, which the district court found insufficient as a permanent repair. The district court also rejected the defendant's suggestion that the damaged section could have been replaced with a sleeve welded in place, finding "a strong possibility of substantial movement at the time of impact" which precluded both methods of repair. The court noted that these techniques could cause leaks and thus endanger the health of Orange Beach's customers.

The district court accepted Orange Beach's contention that replacement of the pipeline was the only feasible alternative, and computed damages by reducing the replacement cost of the new pipeline by the salvage value, and straight-line depreciation based on the increased useful life expectancy, of the original pipeline. In making this assessment, the court rejected the defendants' argument that the replacement cost should be reduced because of the improvement of the new pipeline, which was the same diameter, but some 128 feet longer than the original.

■ 33 U.S.C. § 409 states, in part:

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft . . . .

The district court found that the ALVA violated this section, and two regulations promulgated hereunder, 33 C.F.R. § 162.-75(b)(1) and (b)(3)(i).[2] A finding of statutory fault is primarily a factual issue governed by the clearly erroneous standard. *Florida East Coast Railway Co. v. Revilo Corp.*, 637 F.2d 1060, 1067 (Former 5th Cir. 1981); *Movible Offshore, Inc. v. M/V Wilken A. Falgout*, 471 F.2d 268, 271 (5th Cir. 1973); *see also Marinvicto Compania Naviera, S. A. v. United States*, 381 F.2d 482 (5th Cir. 1967). The district court found that the ALVA moored in close proximity to the pipeline crossing, at night, between two bends in the Waterway which were about a mile apart. Her tow remained doubled up when there was ample time to singly realign the barges. She took up 40 percent of the width of the Waterway, and rendered navigation by other vessels difficult in an area where they would normally be straightening out for the second bend. The findings concerning the mooring and the conditions on the waterway are not clearly erroneous. *See McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Marcona Corp. v. O/S Shifty III*, 615 F.2d 206 (5th Cir. 1980). We concur in the district court's conclusion that the mooring constituted an obstruction to navigation, in violation of 33 U.S.C. § 409 and 33 C.F.R. § 162.75(b)(3)(i).[3]

The ALVA contends that because she took up less than half of the Waterway, she could not have violated the statute and regulations, citing *Marcona Corp. v. O/S Shifty III*, 615 F.2d 206 (5th Cir. 1980), and *The Freeport*, 99 F.2d 842 (4th Cir. 1938). We did not state a rigid "half-channel" rule in *Shifty III*, however. Whether an anchorage or mooring constitutes an obstruction to navigation is to be determined by reference to all the relevant facts and circumstances, including the percentage of the waterway's width which is obstructed. *See The William C. Atwater*, 110 F.2d 644 (2d Cir. 1940); *The Frank*, 40 F.2d 430 (2d Cir. 1930). Thus, in *The Bern*, 166 C.C.A. 495, 255 F. 325 (2d Cir. 1918), the court held that a dredge anchored outside the dredged channel in the Kills, where navigation was difficult under any conditions, created an obstruction where there were alternative locations for anchorage. *Accord The City of Birmingham*, 71 C.C.A. 115, 138 F. 555 (2d Cir.), *cert. denied*, 199 U.S. 607, 26 S.Ct. 747, 50 L.Ed. 331 (1905); *cf. The Hesperos*, 265 F. 921 (4th Cir.) (§ 409 extends to method of anchorage), *cert. denied*, 253 U.S. 497, 40 S.Ct. 587, 64 L.Ed. 1031 (1920). We accordingly conclude that this objection to liability is without merit.[4]

A statutory violation having been established, the burden shifted to the

2. Section 162.75 applies, with exceptions not pertinent here, to "[a]ll navigable waters of the U. S. tributary to or connected by other waterways with the Gulf of Mexico between St. Marks, Florida, and the Rio Grande, Tex., ... and the Gulf Intracoastal Waterway ...." Subsection (b)(1) provides:
 A clear channel shall at all times be left open to permit free and unobstructed navigation by all types of vessels and tows normally using the various waterways covered by the regulations of this section.
 Subsection (b)(3)(i) reads:
 Vessels or tows shall not anchor or moor in any of the land cuts or other narrow parts of the waterway, except in an emergency, or with permission of the District Commander. Whenever it becomes necessary for a vessel or tow to stop in any such protions [sic] of the waterway, it shall be securely fastened to one bank and as close to the bank as possible. This shall be done only at such a place and under such conditions as will not ob-

struct or prevent the passage of other vessels or tows. Stoppages shall be only for such periods as may be necessary.

3. In view of this holding we do not consider the alleged violation of 33 C.F.R. § 162.75(b)(1).

4. The ALVA points out that the case of *Scottish Shire Line, Ltd. v. United States*, 182 F.2d 876, 879–80 (3d Cir. 1950), compels a different result. In that case a moored vessel was not liable where she "was not so far into the channel that she constituted any greater hazard or impediment to traffic than if the [moving vessel] had instead met another vessel standing up the channel for a starboard passing." *Id.* at 880. The district court in the present case apparently credited the testimony of Orange Beach's expert, Captain Summerlin, who stated that "in the distance of three miles, if you are talking on the radio you will run into nobody." He further observed that a tug and tow would not pass through the area if another vessel was

ALVA under the rule of *The Pennsylvania* to show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." 86 U.S. (19 Wall.) at 136, 22 L.Ed. at 151. The rule applies to allisions between a vessel and a stationary object. *Florida East Coast Railway Co. v. Revilo Corp.*, 637 F.2d at 1065. It is not a rule of liability, but shifts the burden of proof as to causation. *Garner v. Cities Service Tankers Corp.*, 456 F.2d 476, 480 (5th Cir. 1972); *Green v. Crow*, 243 F.2d 401, 403 (5th Cir. 1957). This burden is strict, *The Princess Sophia*, 61 F.2d 339, 347 (9th Cir. 1932), *cert. denied*, 288 U.S. 604, 53 S.Ct. 396, 77 L.Ed. 980 (1933), but it is not insurmountable. The former Fifth Circuit Court of Appeals has held that in *The Pennsylvania* the Supreme Court "did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote." *Compania de Maderas de Caibarien, S. A. v. The Queenston Heights*, 220 F.2d 120, 122–123 (5th Cir.), *cert. denied*, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955); *see also Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079 (5th Cir. 1979); *China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769 (5th Cir. 1966), *cert. denied*, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967); *Parker Brothers & Co. v. De Forest*, 221 F.2d 377 (5th Cir. 1955); *accord The YFNX–6*, 156 F.Supp. 325 (D.Md.1957), *aff'd sub nom Gosnell v. United States*, 262 F.2d 559 (4th Cir. 1959).

Even given this limitation, we agree with the district court that the ALVA failed to meet her *Pennsylvania* burden on the issue of causation. There was no evidence of the events of the allision. The district court disregarded Captain Sheffield's opinion that vessels could pass the ALVA with ease, and credited the evidence of the difficulties encountered by other vessels in navigating on the day following the incident. Hence, the ALVA did not meet her burden of showing that the violation could not have been the cause in fact of the mishap. This finding is not clearly erroneous. *See Horton & Horton, Inc. v. T/S J. E. Dyer*, 428 F.2d 1131, 1135 (5th Cir. 1970), *cert. denied*, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971).[5]

The ALVA raises a third point based on the rationale of *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). The celebrated *Palsgraf* rule of "proximate cause" or the "unforeseeable plaintiff"[6] was applied in admiralty in *Diamond State Tel. Co. v. Atlantic Refining Co.*, 205 F.2d 402 (3d Cir. 1953). In *Diamond State* a tanker struck a submarine cable while passing barges engaged in repairing the cable, which had been raised to the deck of the barges. The barges did not display three red lights vertically, as required by the rules of navigation for vessels performing cable work. Holding the tanker not liable for damage to the cable, the court described the cable as "the unforeseeable libellant, a maritime instance of the landlubber's unforeseeable plaintiff." 205 F.2d at 407 (citing *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)),

moored there. Record, vol. 2, at 197–98. This evidence of tight quarters distinguishes our case from the more open reaches of the Upper Bay area of New York Harbor at issue in *Scottish Shire*. 182 F.2d at 878–79.

The careful reader will detect the apparent inconsistency of *Scottish Shire* with *The Bern*, discussed in the text, which involved an allision in a different area of the New York harbor. The opposite results in the two cases underscore our conclusion that the half-channel "rule" urged by the ALVA is not really a rule, but one factor to be taken into consideration.

5. With this conclusion the ALVA's contention that her mooring was a condition rather than a cause, also falls.

6. For purposes of this appeal we need not engage in the debate over whether non-liability for unforeseeable results is a rule of causation, or a rule limiting the scope of duty. *See* D. Dobbs, *Remedies* § 3.3 at 157 n. 36 (1973); W. Prosser, *Torts* § 43 (4th ed. 1971).

and stated that the tanker's captain and crew

could not possibly have foreseen that poor navigation would have subjected libellant's cable to an unreasonable risk of harm *because they neither knew nor should have known that the cable was there.* Thus, as to the cable, there was no duty and, consequently, could be no negligence. Had the flotilla displayed the required three red lights in a vertical line, the risk of harm would have been foreseeable, thus giving birth to a duty of prudent navigation toward the cable.

Libellant makes much of the fact that the location is marked on the chart as a cable area, contending that this is notice enough that the flotilla was engaged in cable work. We are not prepared to say that the marking on the chart to the effect that there are submarine cables there is sufficient notice that any vessels in that area have raised the cables to their decks, when those vessels are not showing the required lights. It is admitted that libellant made no effort to publish the fact of their repair work in the "Weekly Notice to Mariners," even though it knew three weeks beforehand that they were going to work on the cable.

207 F.2d at 407 (emphasis added); *see also Casement v. Brown,* 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582 (1893). To the same effect are *American Zinc Co. v. Foster,* 313 F.Supp. 671 (S.D.Miss.1970), *modified on other grounds,* 441 F.2d 110 (5th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971), and *In re Martin,* 102 F.Supp. 43 (E.D.Pa.1951).

■ Although the ALVA requested findings of fact and conclusions of law on this issue, *see* Supplemental Record, Defendant's Proposed Findings of Fact 6, Conclusions of Law 14, 15, the district court did not address it in its order. Findings on this issue are necessary, and it is appropriate that on this record the facts be addressed by the district court in the first instance. *E.g., In re Legel, Braswell Government Securities Corp.,* 648 F.2d 321 (Former 5th Cir. 1981); *Gulf Towing Co. v. Steam Tanker, Amoco New York,* 648 F.2d 242 (Former 5th Cir. 1981); *Kratzer v. Capital Marine Supply Co.,* 645 F.2d 477 (Former 5th Cir. 1981).

■ The ALVA asserts that the fault of Orange Beach contributed to the damage in three respects: (1) failure to maintain a buoy to mark the pipeline, (2) violation of paragraph I.u. of the permit issued by the Corps, and (3) failure to maintain a four foot cover for the width of the Waterway, as required by the permit. Paragraph I.u. prohibited Orange Beach from causing an unreasonable interference with navigation by the existence of the pipeline within the other terms of the permit. On our view of the evidence, the failure to ensure that the pipeline was protected in its obviously precarious position constituted a violation of this provision, and the district court's determination to the contrary is clearly erroneous.[7]

■ 33 U.S.C. § 403 provides, in part: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited . . . ." The duty not to create an obstruction to navigation extends to the entire width of a navigable waterway, and is not limited to the dredged channel. *United States v. Raven,* 500 F.2d 728, 732 (5th Cir. 1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *United States v. Joseph G. Moretti, Inc.,* 478 F.2d 418, 428–29, 429 n. 37 (5th Cir. 1973); *accord Norfolk & Western Co. v. United States,* 641 F.2d 1201, 1211 (6th Cir. 1980); *Red Star Towing & Transportation Co. v. Woodburn,* 18 F.2d 77 (2d Cir. 1927); *cf. United States v. DeFelice,*

_____

**7.** We do not reach the grounds of failure to mark the pipeline and failure to maintain a four foot cover.

641 F.2d 1169 (Former 5th Cir.) (sloughs and marshes), *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981); *United States v. Ray,* 423 F.2d 16 (5th Cir. 1970) (coral reefs). This duty is breached where a structure not initially an obstruction to navigation becomes one because of improper maintenance. *Corby v. Ramsdell,* 48 F.2d 701 (2d Cir. 1931); *Gulf Oil Corp. v. The Tug Gulf Explorer,* 337 F.Supp. 709 (E.D. La.1971) (movement of pipeline caused by hurricane), *aff'd mem.* 472 F.2d 1406 (5th Cir. 1973); *Pacific Gas & Electric Co. v. The S. S. Lompoc,* 291 F.Supp. 767 (N.D.Cal. 1968); *cf. United States v. Illinois Terminal Railroad Co.,* 501 F.Supp. 18 (E.D.Mo.1980) (changed traffic conditions). *But cf. United States v. Bigan,* 170 F.Supp. 219 (W.D. Pa.1959) (cloudburst caused debris on land to form obstruction), *aff'd,* 274 F.2d 729 (3d Cir. 1960).

■ The condition of the pipeline on March 29, 1979 clearly constituted an "unreasonable" obstruction to navigation. It is undisputed that vessels with nine foot drafts regularly traveled this portion of the Waterway. Witnesses for both parties testified that empty tows were often required to travel well outside the dredged channel, close to the banks, when passing loaded vessels. The pipeline was struck well into the Waterway, at the depth of 8 to 9 feet, which would correspond to the draft of a tug or a loaded tow. All this happened while Orange Beach was well aware of the potential consequences of failing to maintain the pipeline. Indeed, the injury which occurred was the most obvious consequence.[8]

■ The failure to comply with a permit issued by the Corps triggers the application of the rule of *The Pennsylvania. American*

*Zinc Co. v. Foster,* 313 F.Supp. 671 (S.D. Miss.1970), *modified on other grounds,* 441 F.2d 1100 (5th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); *accord In re Wasson,* 495 F.2d 571, 579 (7th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 (1974). It is indisputable, on the evidence presented, that failure to maintain the pipeline contributed to the damage. For this reason, the case must be remanded to the district court for apportionment of damages. *Gele v. Chevron Oil Co.,* 574 F.2d 243, 250 (5th Cir. 1978); *see United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

■ We turn, finally, to the district court's assessment of damages. The determination of the amount of damages may be overturned only if clearly erroneous. *Florida East Coast Railway Co. v. Revilo Corp.,* 637 F.2d 1060, 1067 (Former 5th Cir. 1981); *Seemann v. Berger,* 556 F.2d 726, 727 (5th Cir. 1977); *accord Getty Oil Co. v. S. S. Ponce de Leon,* 555 F.2d 328, 334–35 (2d Cir. 1977). The finding that the clamp served only as a temporary repair was not clearly erroneous. *See Bunge Corp. v. American Commercial Barge Line Co.,* 630 F.2d 1236, 1241–42 (7th Cir. 1980). We reach a contrary conclusion, however, on the district court's failure to reduce the replacement cost because of the improvement to the new pipeline.

■ Where a structure is totally lost in an allision, the measure of damages is the market value at the time of destruction, less salvage value. *See The Baltimore,* 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869); *B & M Towing Co. v. Wittliff,* 258 F.2d 473 (5th Cir. 1958); *see* D. Dobbs, *Remedies* § 5.12 at 391 (1973); C. McCormick, *Damages*

---

8. It is immaterial for this purpose that the pipeline may have been covered by the soft mud of the bank, for navigable waters include the muds along the shore through which vessels are capable of running. *Western Union Tel. Co. v. Inman & I. S. S. Co.,* 59 F. 365 (2d Cir. 1894); *Jones Towing, Inc. v. United States,*

277 F.Supp. 839, 848 (E.D.La.1967); *In re Martin,* 102 F.Supp. 43 (E.D.Pa.1951). *But cf. Interlake Iron Corp. v. Gartland S. S. Co.,* 121 F.2d 267 (6th Cir. 1941) (vessel stranded in soft mud unseaworthy in absence of evidence that passage through mud is customary).

§ 124 (1935). Where no market value has been established by recent comparable sales,

> other evidence is admissible touching value such as the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair which the [structure] was in, ... and the like.

*Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950); D. Dobbs, *supra*, § 5.12 at 391.

Although straight-line depreciation has been approved for reduction of replacement cost in certain circumstances, *see Freeport Sulphur Co. v. S. S. Hermosa*, 526 F.2d 300 (5th Cir. 1976), the former Fifth Circuit Court of Appeals has long held "that no fixed rule of depreciation per annum can be adopted as a safe criterion of ... value .... The kind and quality of material originally used, the care and use, state of repair maintained, are all essential matters to be considered." *The J. E. Trudeau*, 4 C.C.A. 657, 54 F. 907, 912 (5th Cir. 1893) (steamboat). The Supreme Court similarly ruled that the rate of depreciation is affected by maintenance, *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 158, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925), and required the award to be reduced where "the repairs necessarily made were chargeable not wholly to the collision, but to the age and previous condition of the boat." *Sturgis v. Clough*, 68 U.S. (1 Wall.) 269, 17 L.Ed. 580 (1864).

Following these well established rules of damages, the Fifth Circuit Court of Appeals held in *Walaas v. Johnson*, 122 C.C.A. 626, 204 F. 440, 442 (5th Cir. 1913), that "[i]t is not just that the owners of this old boat should continue her in service with her con-

cealed infirmities until an accident compels repairs or rebuilding, and then recover as for a total loss at the expense of others." [9]

 The evidence established clearly that the pipeline had deteriorated during its first four and one-half years at a rate much greater than straight-line depreciation, as a result of the erosion. The district court erred in failing to take this deterioration into consideration in computing damages.

In summary, we remand for a determination of the issue of proximate cause, and recomputation and apportionment of damages in the event the district court again finds liability against the ALVA.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

**9.** This rule is indeed older than the courts of the United States themselves. Article 14 of the Laws of Oleron, adopted in or before 1266 for the Duchy of Guienne, France, states:

> If a vessel, being moored, lying at anchor, be struck ... the whole damage shall be in common, and be equally divided and appraised half by half .... The reason why

this judgment was first given, being, that an old decayed vessel might not purposely be put in the way of a better ....

Laws of Oleron, Art. 14 (1266), *reprinted in* 30 F.Cas. 1171, 1187 (1897); *accord* Laws of Wisbuy, Art. 26 (undated), *reprinted in* 30 F.Cas. 1189, 1191 (1897).