THE BERN. THE NATIONAL. APPEAL OF MARYLAND DREDGING & CONTRACTING CO. et al.

(Circuit Court of Appeals, Second Circuit. December 11, 1918.)

No. 84.

1. COLLISION ⟪=⟫71(3)—LIABILITY—DREDGE AT ANCHOR.

Where a dredge at the time of collision was anchored at such a point as to obstruct navigation and a canal boat in tow of a tug collided with it, *held*, that the dredge was solely at fault and liable for full damages.

2. COLLISION ⟪=⟫71(2)—DREDGE AT ANCHOR—FAULT OF TOWING TUG.

A tug in charge of a tow of canal boats which was assisted by other tugs *held* not at fault in failing to send out a scout tug to ascertain the whereabouts of a dredge which was improperly anchored while not in operation at a point impeding navigation; and hence, where one of the canal boats collided with the dredge, the tug was not liable.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Theodore Miller against the steam tug Bern, her engines, etc., claimed by the Philadelphia & Reading Railway Company, which brought in Atlantic Gulf & Pacific Company and the dredge National, her engines, etc., claimed by the Maryland Dredging & Contracting Company. From a decree against the dredge National for full damage and dismissing the libel against the steam tug Bern, the Maryland Dredging Company and the Atlantic Gulf & Pacific Company appeal. Affirmed.

Russell H. Robbins, of New York City (Alfred C. Coxe, Jr., of New York City, of counsel), for appellants.

Macklin, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for the Bern.

Park & Mattison, of New York City, for libelant.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. Theodore Miller, owner of the Helen A. Miller and bailee of a cargo of coal thereon, filed this libel against

the steam tug Bern complaining that, through the negligent operation of the Bern while conducting a tow of canal boats through the Kills, the Helen A. Miller, which was the outside starboard boat in the third tier of the tow, was on or about the 12th of March, 1915, brought into collision with the dredge National, owned by the Maryland Dredging & Contracting Company, anchored in the Kills below the Baltimore & Ohio bridge, and was sunk.

Under the fifty-ninth rule (29 Sup. Ct. xlvi), the owner and claimant of the Bern, the Philadelphia & Reading Railway Company, brought into the cause the dredge National. The Atlantic, Gulf & Pacific Company had a contract with the United States government for dredging work in the Kills, and the dredge National was at work upon this contract with this company. The day before March 11, 1915, the tow, consisting of 21 coal barges, was made up at Port Reading bound for Mott Haven. Each of these barges was 100 feet long and from 20 to 25 feet beam. They were arranged four abreast of one another in each of the first three tiers, and three in each of the remaining three tiers. As thus arranged, they were towed on two hawsers. The Bern, a seagoing tug, drawing 13 feet of water, had two tugs assisting, the Ashbourne and the Pencoyd, the latter on the starboard side of the fourth tier directly astern of the Miller, the former in the second tier from the rear on the same side. With a flood tide and clear weather, she intended to pass through the Staten Island opening in the bridge, and the first the master of the Bern saw of the dredge was when he was navigating this side of Buckwheat Island. The dredge had ceased working the evening before and was moved about 25 feet outside of the dredged channel and about 300 feet below the bridge. Here there was a set of the tide from the Jersey shore over to the Staten Island side, requiring the two helper tugs to be on the starboard side so as to overcome this set and straighten the tow so that it could safely pass through the 200-foot space between the center abutment of the bridge and the Staten Island abutment. The National advanced no good reason why it was located as indicated above. Concededly, navigation through the Kills below the bridge requires great care and skill, and it was a most dangerous spot to have permitted the dredge to remain, when there was no occasion therefor. There was abundant room for the dredge to move nearer the Staten Island shore or closer to the abutment so as to give the tow additional room to maneuver.

The master of the tug L'Hommedieu testified that, on the evening before, he moved the dredge out of the channel, putting it behind the Staten Island abutment, and did likewise on several occasions, stating that he had no trouble in so doing.

[1] We agree with the District Judge that the dredge at the time of the collision was in an uncalled-for, undesirable, and dangerous location, and but for its presence there would have been no accident. While the National, because of the contract for dredging, had some rights in the Kills when in operation. still, conceding, as appellant does, that the dredge was not actually working on the night in question, we are obliged to hold that it was not necessary for her to lay up for the night where she did, when there was another place with plenty of

water where she might move to and make clear the path of passing tows.

The authorities cited by appellant were both in this court and are distinguishable.

In Northrup v. Philadelphia & R. Ry. Co. et al., 234 Fed. 264, 148 C. C. A. 166, a collision occurred in the Arthur Kill between a canal boat forming part of a tow of 15 boats in tiers of three, and a scow alongside of a dredge engaged in deepening the channel. There, one of the towing tugs was held at fault in directing the casting off of the lines between the rear starboard boat which was to be taken out of the tow and the boat ahead of it, but continuing to push at the stern of the latter boat, which forced the latter boat out of the course of the tow and in collision with the scow. The dredge was held not in fault as obstructing the channel, the court saying:

"The dredge was engaged under the supervision of the government in dredging the waters of the Kill von Kull at a point where a channel 400 feet wide had to be deepened. The channel between the dredge and the New Jersey shore was 450 feet; and between the side of the scow next to the dredge and receiving the dredged material and the shore it was 415 feet. The contract between the dredging company and the government expressly requires the contractor to conduct the work in such a manner as to obstruct navigation as little as possible, and, in case the contractor's plant so obstructs the channel as to impede the passage of vessels, it must promptly be so moved as to afford a practicable passage on the approach of any vessel."

But it appeared that the dredge was engaged in work on the night and at the time of the collision.

In The Wyomissing, 232 Fed. 451, 146 C. C. A. 445, where there was a collision under somewhat similar facts as existed in the Northrup Case, above, it appeared that there was an unobstructed channel 400 feet wide through which the tow could have passed safely if properly navigated. The dredge was actually engaged at work, and it was held that it was not at fault in failing to get out of the way of the passing tow.

In the present case, the dredge was not engaged in work, and, in the location it was at the time of the collision, those in charge did not exercise a due regard for the rights of tows in passing; in other words, if it was placed nearer the Staten Island shore in back of the abutment, no damage would have occurred.

[2] It appears that there was an agreement between the parties requiring the sending ahead of scout tugs only when the dredge was in operation at night. But under the circumstances disclosed here, we do not think the Bern was required, either under this agreement or in the exercise of due diligence, to send ahead a scout tug.

Decree affirmed.