**DREDGE CARTEGENA, her engines, tackle, boilers, equipment, etc., and Standard Dredging Company, her owner, Appellees,**

v.

**The T/T P. W. THIRTLE, her engines, boilers, etc., Petroleum Tankers, Inc., as Owner and Sinclair Refining Company, her owner, Appellants.**

**A/S SKAUGAAS (I. M. Skaugen) as Owners of the NORWEGIAN MOTOR VESSEL SKAUSTRAND, Appellant,**

v.

**DREDGE CARTEGENA, her engines, tackle, boilers, equipment, etc., and Standard Dredging Company, Appellees.**

**Nos. 9749, 9750.**

United States Court of Appeals
Fourth Circuit.

Argued March 5, 1965.

Decided April 26, 1965.

logging seasons, and the conduct of Diamond and Firchau leading into the 1961 season.

Charles S. Haight, New York City (Haight, Gardner, Poor & Havens, New York City, and Niles, Barton, Gans & Markell, Baltimore, Md., and Charles S. Haight, Jr., New York City, Carlyle Barton, Jr., and Donald A. Krach, Baltimore, Md., on brief), for appellant in No. 9749.

Stanley R. Wright, New York City (William A. Grimes and Thomas W. Jamison, III, and Ober, Williams & Grimes, Baltimore, Md., and Burlingham, Underwood, Barron, Wright & White, New York City, on brief), for appellants in No. 9750.

Richard H. Brown, Jr., New York City (John H. Skeen, Jr., Baltimore, Md., and John F. Gerity, New York City, and Skeen, Wilson & Coughlin, Baltimore, Md., and Kirlin, Campbell & Keating, New York City, on brief), for appellees in Nos. 9749 and 9750.

Before SOBELOFF and J. SPENCER BELL, Circuit Judges, and LARKINS, District Judge.

SOBELOFF, Circuit Judge:

In these cases two vessels that were in collision seek to cast part of the blame for their misfortune upon a dredge anchored near the point of impact. These appeals are from the final decree of the District Court exonerating the Standard Dredging Co., owner of the dredge CARTEGENA, from fault in a collision between the SKAUSTRAND and the P. W. THIRTLE.

In the early evening of February 4, 1963, the SKAUSTRAND, a diesel ore carrier, was heading west-northwest toward the port of Baltimore in the Brewerton Angle. The Brewerton Angle leads into the McHenry Channel which continues northwest into the inner harbor. At the same time the tanker P. W. THIRTLE, bound for the sea, was traveling east in the Curtis Bay Channel, which meets with and ends at the McHenry Channel, 6900 feet northwest from the Brewerton Angle.

The dredge CARTEGENA, 240 feet long with a 48 foot beam, was anchored in the western half of the 600 foot wide McHenry Channel, 1460 feet southeast from the Curtis Bay Channel. She was spudded 100 feet west of the center line of the McHenry Channel. After the THIRTLE had turned into the McHenry Channel, she was required to take and took a course further to the east than would ordinarily be necessary to avoid the dredge. As the THIRTLE proceeded southeast she was visible to the approaching SKAUSTRAND, then about one mile distant. Likewise the SKAUSTRAND saw the oncoming THIRTLE. Yet at 6:19 p. m. they collided about 100 feet east of the center line of the Channel, slightly to the southeast of the dredge.

The District Court held both of the colliding ships liable for the accident— the THIRTLE for violating the crossing rule, turning into the McHenry Channel at an excessive speed, failing to note the approach of the SKAUSTRAND, and failing to stop her engines; the SKAUSTRAND for traveling at an excessive speed, failing to maintain a proper lookout, and failing to change course promptly. No appeal has been noted by either party from this holding.

The THIRTLE and the SKAUSTRAND, however, united in contending that the dredge CARTEGENA was partly to blame for the collision. They advanced two reasons in support of this contention, both of which the District Judge rejected, holding the two colliding

vessels solely responsible and absolving the CARTEGENA. It is this decision that the appellants here challenge.

First they maintain that the dredge was at fault in unnecessarily obstructing the McHenry Channel at the time of the collision. Several days earlier the CARTEGENA had been forced out of the Channel by ice conditions, but was moved back into the Channel on the morning of February 4 to resume digging. During the day surveys were undertaken, spars were located to serve as guides for the dredge operator, and construction was begun on a pipeline to be used in discharging the dredged material into nearby shoals. No digging was done, however, until 7:30 that evening because the cutter motor would not function properly.

Buoys were placed 50 feet west of the Channel's center line between 8:00 and 9:30 a. m. The dredge was then towed to a position 100 feet west of the center line. The dredge's records for that day reveal only that the motor trouble was discovered at some time after 8:00 a. m. The records do not disclose the length of the delay caused by this malfunction, and we are told only that digging began at 7:30 p. m., one hour after the collision. Furthermore, it is not shown that the motor trouble existed or was discovered before the dredge was positioned in the Channel.

The applicable pilot rule provides that "channels shall not be obstructed unnecessarily by any dredge * * *." 33 C.F.R., ch. 1, § 80.30 (1962). The appellants contend that the CARTEGENA was unnecessarily in the Channel at the time of the collision.

In order to resume the work the crew of the dredge was required to make certain preparations that took the better part of the day. Buoys and spars had to be located, and a pipeline constructed. These preparations had the unavoidable effect of narrowing the Channel. When these were completed and the motor repaired, digging was resumed, approximately one hour after the collision, and continued through the night.

In the course of the preceding 24 hours the Coast Guard had issued several radio warnings that the McHenry Channel had been narrowed by the activities of the dredge. Long before the collision both the THIRTLE and the SKAUSTRAND observed the dredge's presence.

This circuit has held that it is permissible for a "working" dredge to remain in channel while moving its pipelines and making minor repairs to its engine. The Freeport, 99 F.2d 842 (4th Cir. 1938). Such was the case here. The Channel was obstructed only while the dredge's crew was making necessary preparations to resume digging. Decisions cited by the appellants are not in point, for they are concerned with the liability of dredges needlessly obstructing a channel at night when they are neither digging nor preparing to dig. Otto Marmet Coal & Mining Co. v. Fieger-Austin Dredging Co., 259 F. 435 (6th Cir.), cert. denied, 250 U.S. 666, 40 S.Ct. 13, 63 L.Ed. 1197 (1919); The Bern, 255 F. 325 (2d Cir. 1918); The City of Birmingham, 138 F. 555 (2d Cir.), cert. denied, 199 U.S. 607, 26 S. Ct. 747, 50 L.Ed. 331 (1905). We affirm the holding of the District Court that the dredge was not unnecessarily present in the McHenry Channel at the time in question.

Appellants also seek to hold the dredge liable for the whistle signals it gave and failed to give. The sequence of events upon which the THIRTLE and the SKAUSTRAND seek to base such liability began at 6:10 p. m. when the THIRTLE, moving east in the Curtis Bay Channel, blew a one blast signal to the dredge. This signal was given pursuant to Coast Guard Rule, 33 C.F.R., ch. 1 § 80.26(a) (1962), which requires a vessel intending to pass a dredge to signify that intention "by one long blast of the whistle," whereupon the vessel attempting to pass "shall be directed to the proper side for passage by the sound-

ing, by the dredge," of the proper signal. The rule goes on to provide:

"If the channel is not clear, the [dredge] shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the [dredge]."

It was the THIRTLE's intention to make a starboard turn into the McHenry Channel and proceed southeast past the dredge.

Noting that the THIRTLE was much closer than the approaching SKAUSTRAND, the dredge gave a two blast reply signifying that a safe passage could be made on the dredge's starboard side. This response was not negligent or inappropriate even if we assume *arguendo* that the dredge was being asked about conditions other than those of which she was uniquely aware. At the time of the response the THIRTLE was almost a mile closer to the dredge than was the SKAUSTRAND. As found by the District Court, the collision would not have occurred if the SKAUSTRAND had been maintaining a safe speed. The dredge was well warranted in assuming that such was the case and that the SKAUSTRAND would make such alteration in its speed as prudence would suggest as it neared the THIRTLE. Furthermore, the SKAUSTRAND had given no indication of an intention to pass. For all that the dredge knew, the SKAUSTRAND could have been planning to stop or turn off into the Channel running east from the McHenry Channel southeast of the dredge. Even after the dredge gave its response to the THIRTLE the SKAUSTRAND never indicated that she planned to pass the dredge. If the SKAUSTRAND had given such indication it would seem reasonable to assume that she would have received a danger signal in reply, for the dredge knew the THIRTLE was preparing to pass. Moreover, there is no showing that the dredge became aware of the danger created by the converging ships in time to warn them of the impending collision.

We agree with the District Court that the actions of the CARTEGENA's personnel in the ten minutes before the collision did not constitute negligence and consequently she and her owners should not share in the loss.

Affirmed.