[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15467

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2011
JOHN LEY
CLERK

D.C. Docket No. 06-00332-CV-3-MCR-EMT

HATT 65, LLC, FRANK W. BOYKIN, II,
Family Trust,

Plaintiffs-Appellants,

versus

TERRY KREITZBERG, S/V "ESCAPE",
in rem, GREAT LAKES REINSURANCE
(UK) PLC,

Defendants-Appellees,

BANK OF PENSACOLA,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 29, 2011)

Before TJOFLAT, WILSON and RIPPLE,[*] Circuit Judges.

PER CURIAM:

The plaintiffs, Hatt 65, LLC and the Frank W. Boykin, II, Family Trust ("the Trust"), brought this action against the defendants Terry Kreitzberg and the S/V ESCAPE for damages sustained by the fishing yacht, the WEJ, during Hurricane Dennis.[1]  After a four-day bench trial, the district court entered judgment for the defendants, and the plaintiffs timely appealed.[2]

---

[*]  Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1]  Hatt 65, LLC is the owner of the injured craft, the WEJ; the Frank W. Boykin, II, Family Trust is an Alabama trust that owned the real property, dock, boat lifts, equipment and improvements located on the same property as the WEJ; and Frank W. Boykin II is the sole beneficial owner of the Boykin Trust, as well as the principal of Hatt 65.

The case initially included a claim against Hatt 65's insurer, Great Lakes Reinsurance (UK) PLC; however, the parties settled that claim, which was then dismissed with prejudice by the court.

Prior to trial, the district court also dismissed the plaintiffs' claim for loss of market value to the WEJ.  Because we affirm the district court's judgment for Mr. Kreitzberg, we do not address the merits of this claim.

[2]  The district court had subject matter jurisdiction over this claim in admiralty.  See U.S. Const. art III, § 2; 28 U.S.C. § 1331(1).  We have jurisdiction over the final judgment of the district court pursuant to 28 U.S.C. § 1291.

2

# I

# BACKGROUND

## A.

The district court rested its judgment on the following factual findings. "On July 8, 2005, the National Hurricane Center (NHC) issued a hurricane watch that included all areas along the coastline of the Gulf of Mexico"; "the watch was upgraded to a hurricane warning, indicating that hurricane force conditions were expected within 24 hours or less." Hatt 65, LLC v. Kreitzberg, No. 3:06cv332, 2009 WL 3163220, at *2 (N.D. Fla. Sept. 30, 2009). The NHC forecasted the expected path of the storm to pass west of Gulf Breeze, Florida, and to make landfall at Mobile Bay, Alabama. This track "would have resulted in winds hitting the Gulf Breeze area from the south and west." Id. Had Hurricane Dennis followed its anticipated path, "the waters along the protected northern shores of Gulf Breeze would have experienced little wave action . . . because of the protection afforded by the peninsula's land mass." Id. Finally, if the storm had taken its projected path, "the greater fetch[3] of the wind blowing north across Pensacola Bay would have driven the biggest waves and destruction away from

---

[3] "'[F]etch' means the distance across water that wind blows unimpeded. The greater the fetch, the greater the wind and wave forces." Hatt 65, LLC v. Kreitzberg, No. 3:06cv332, 2009 WL 3163220, at *2 n.6 (N.D. Fla. Sept. 30, 2009).

Gulf Breeze and toward Pensacola." Id.

Mr. Kreitzberg was an "experienced mariner." Id. at *4. He "had purchased the *Escape* in March 2005 and kept it in a slip at the Pier One Marina, located just north of the mouth of Hoffman Bayou," in Gulf Breeze. Id. at *4. Mr. Kreitzberg "began his hurricane preparations in May 2005." Id. He first inquired of local mariners about the best location to moor the ESCAPE during a hurricane; specifically, he spoke to Wayne Wheatley, the owner of the Pier One Marina. Wheatley described for Mr. Kreitzberg the placement and type of mooring that he had used for his 42-foot catamaran, which had survived Hurricane Ivan the previous year. Mr. Kreitzberg constructed a similar mooring out of concrete, metal rebar and chain. In June 2005, Mr. Kreitzberg placed the mooring "in the mud bottom outside the marina at the mouth of Hoffman Bayou." Id.[4] "He did not obtain a permit for [his] mooring buoy." Id.

Based on the anticipated path of Hurricane Dennis, Mr. Kreitzberg's "mooring appeared to be in a relatively protected spot." Id. The ESCAPE's "main mast was too tall to pass under the Pensacola Bay Bridge," and, consequently,

_____

[4] There was conflicting testimony regarding whether the bottom of Hoffman Bayou, where Mr. Kreitzberg placed his mooring, was mud, mud mixed with sand or just sand; however, the district court credited Mr. Kreitzberg's testimony that, based on his own personal observation, the bottom was mud. Hatt 65, 2009 WL 3163220, at *5 n.17.

4

Mr. Kreitzberg "could not take the *Escape* farther east." Id. Moving the ESCAPE to the west would have brought it closer to the projected path of the hurricane. Mr. Kreitzberg therefore "attached the *Escape* to his concrete mooring using a 40-foot rope to make a 20-foot bridle with a rubber tire to absorb the shock." Id. The district court also credited Mr. Kreitzberg's testimony that he set a Super Max storm anchor--capable of holding 80,000 pounds (compared to the ESCAPE's 48,800 pounds)--with snubber by dropping it and reversing the engines.[5] Mr. Kreitzberg "also attached a line to another nearby mooring as a backup." Id.

On the morning of July 10, 2005, "Frank Boykin, who lives along the north shore of Gulf Breeze on property overlooking Hoffman Bayou," made his own hurricane preparations with the help of Brian Finkbone, Mark Braxton and Dan Green. Id. at *3. "[E]xpecting the storm to make landfall to the west, they moved the *WEJ*, Boykin's 1990 65-foot Hatteras convertible sport fisherman vessel, "out from its ordinary slip at the dock and turned it to face east." Id. "They deployed two anchors. . . . A number of mooring lines of new heavy nylon were tied from the *WEJ* to freestanding pilings on both sides of the *WEJ*, the dock behind the *WEJ*, and a tree on shore." Id.

---

[5] Mr. Kreitzberg took other precautions with respect to the sails and masts; the adequacy of these actions do not appear to be disputed.

5

"Boykin's house faces north toward Hoffman Bayou"; it overlooks the dock and the vessels, "which are clearly visible from inside the house." Id. Early in the storm, Boykin and his friends

> were able to see across the bayou and into Pensacola Bay from inside the Boykin residence. Finkbone and Braxton had noticed two sailboats out in the bay that appeared to be drifting. At approximately 9:00 in the morning, Finkbone took a photograph which shows one large sailboat, the *Escape*, and one smaller sailboat. They appear in the photograph to be close together, and Braxton said that he observed them hit each other. The photograph was taken with a zoom lens at a distance of approximately 150 yards. Finkbone testified that the larger sailboat had moved 200 yards or so since early morning but that he did not actually see it dragging from its mooring because that would be difficult to detect. Finkbone last saw the *Escape* in the bay at 11:30 a.m.; after that, it was nowhere in sight.

Id. (footnote omitted).

Boykin estimated that, at 9:00 a.m., the wind was around 25 mph; however, at 9:00 a.m., the Pensacola Naval Air Station measured the wind speed at 31 mph, with gusts of up to 46 mph, blowing out of the north/northeast. One of Mr. Kreitzberg's experts, Dr. Lee Branscome, "testified that the winds would have been higher where the *Escape* was moored because of the wind direction and the fetch." Id. at *3 n.10. By 10:00 a.m., the Naval Air Station was registering a wind speed of 32 mph with gusts of 48 mph.

Earlier that morning, the 4:00 a.m. NHC forecast projected "the storm to

6

make landfall near Mobile Bay to the west" of Gulf Breeze. Id. at *2. "At the last minute, however, the storm's actual path unexpectedly took the eye of the storm east of Gulf Breeze." Id. This alteration in course "drove the strongest winds from the western part of the eyewall across Pensacola Bay and toward Gulf Breeze, rotating in from the north and then the northwest." Id.[6] "As the storm came on shore in early afternoon, visibility in the bayou was limited." Id. at *3. "At 1:45 p.m. . . ., the winds from the north area were approaching hurricane force in the Gulf Breeze area." Id. at *2. "[B]etween 2:00 and 2:30 p.m., there were times when the people inside the Boykin residence could not see the *WEJ* due to whiteout conditions caused by severe wind and rain." Id. at *3. Coupled with the wind and driving rain, there was a storm surge of up to five feet and three-foot waves along the northern edge of Gulf Breeze, including Hoffman Bayou.

"[A]t 2:27 in the afternoon, the center of the eye of Hurricane Dennis made landfall . . . eight miles east of Gulf Breeze," farther east than originally predicted. Id. at *1 (footnote omitted). The sustained winds, "blowing from the northwest across Pensacola Bay toward Gulf Breeze and straight into Hoffman Bayou, were 85 to 90 mph, with peak gusts of 105 mph." Id. at *2.

---

[6] The district court found that, "[b]y the time it was evident that the storm would pass to the east of Gulf Breeze, bringing the strongest winds from the north and northwest, it was too late for Kreitzberg to alter his plans." Hatt 65, 2009 WL 3163220, at *4.

"When the storm let up, the *WEJ* was gone. Boykin and friends went outside in search of it and found the *WEJ* beached on a spit of neighboring land protruding into Hoffman Bayou and due east of where the *WEJ* had been moored." Id. at *3. "Boykin believed that the *Escape* had allided with the *WEJ* by crossing its anchor line, pulling the *WEJ* from its mooring, and that the mast and spreader of the *Escape* had made contact with the outrigger antenna on the *WEJ*." Id. Other witnesses confirmed Boykin's theory that the ESCAPE had allided with the WEJ during the storm. Specifically, the ESCAPE likely passed over the WEJ's anchor line, causing the vessels to come into contact on the port side of the WEJ.

Mr. Kreitzberg presented the testimony of a meteorologist, Dr. Branscome, and an expert in seamanship, Thomas Danti. Dr. Branscome testified that the change in the course of the storm created wind and sea conditions in the Gulf Breeze area that were worse than had been anticipated. Danti testified that Mr. Kreitzberg's "actions in preparing the *Escape* for the storm constituted reasonable seamanship under the circumstances." Id. at *5. Notably, he testified that "[t]he concrete mooring itself and the method Kreitzberg used to connect it to the vessel w[ere] 'totally acceptable.'" Id.

8

**B.**

In rendering its judgment, the district court first observed that "[s]everal well-established principles . . . govern the determination of liability and fault in admiralty cases." Id. at *6. First among these was the <u>Louisiana</u> rule, which "creates a rebuttable presumption that[,] where a drifting vessel has allided with a stationary vessel or object, the drifting vessel is at fault." Id. (citing <u>The Louisiana</u>, 70 U.S. (3 Wall.) 164, 18 L. Ed. 85 (1865)). Thus, the "threshold question" was "whether there was an allision between the *Escape* and the moored *WEJ*." Id. The court found "by a preponderance of the evidence that an allision [had] occurred between a drifting vessel, the *Escape*, and a stationary object, the anchor line of the *WEJ*." Id. at *7. Consequently, Mr. Kreitzberg was presumed to be at fault unless he was able to rebut the presumption.

The court then explained that

> [t]he owner of the drifting vessel may rebut the presumption of fault that arises under the <u>Louisiana</u> rule by a preponderance of evidence in support of one of the following defenses: (1) "that the allision was the fault of the stationary object;" (2) "that the moving vessel acted with reasonable care;" or (3) "that the allision was an unavoidable accident."

Id. (quoting <u>Fischer v. S/Y NERAIDA</u>, 508 F.3d 586, 593 (11th Cir. 2007)). The court determined that two of the available defenses had been established. First,

9

Mr. Kreitzberg had acted with reasonable care in securing the ESCAPE. The district court noted that Mr. Kreitzberg's expert had testified that his "preparations were reasonable and 'textbook.'" Id. at *8. The plaintiffs did not present any contrary expert testimony but "responded only that Kreitzberg's negligence was obvious because witnesses had observed the *Escape* dragging its mooring early in the morning of July 10th, well before the storm was raging." Id. The district court determined that, because Mr. Kreitzberg successfully had rebutted the presumption of the Louisiana rule, an assertion of res ipsa loquitur was insufficient to carry the day: "The court will not impose another inference based solely upon the fact that [Mr.] Kreitzberg's preparations, though reasonable, ultimately failed to prevent the accident, especially in the absence of conflicting expert testimony." Id.

The district court noted that, because it had determined that the defendants had satisfied one of the possible defenses, it did not need to reach the other possible defense--that the accident was unavoidable due to Hurricane Dennis. However, it concluded that, if it had reached this question, it would have determined that the accident was unavoidable because, through the reasonable efforts of its owner, the ESCAPE had been moored in a good location to weather the expected storm, a location that turned out to be "the worst possible spot" when

10

the storm took an unexpected turn.  Id. at *9.

The district court next concluded that the Pennsylvania rule, see The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L. Ed. 148, 151 (1873), which "shifts the burden of proof" to the vessel "in violation of a statutory rule intended to prevent accidents," Hatt 65, 2009 WL 3163220, at *10 (quotation marks omitted), did not provide a basis for liability.  The plaintiffs had maintained that Mr. Kreitzberg's failure to obtain a permit for his mooring constituted such a violation and therefore placed on Mr. Kreitzberg the burden of establishing that the violation "could not have been a contributory cause of the allision."  Id. (quotation marks omitted).  The district court disagreed that the Pennsylvania rule was applicable because the plaintiffs had not demonstrated that this permit was intended to prevent accidents of the type involved in this case.  The district court therefore entered judgment on behalf of the defendants.

# II

## DISCUSSION

### A.

On appeal, the plaintiffs first argue that the district court erred in concluding that Mr. Kreitzberg had rebutted the presumption of fault created by the Louisiana

11

rule. The plaintiffs agree that the district court correctly stated the applicable rule: When a vessel, moving or drifting due to an external force, such as the current or the wind, allides with a stationary object, the moving vessel is presumptively at fault. See The Louisiana, 70 U.S. (3 Wall.) 164, 173, 18 L. Ed. 85, 88 (1865). The plaintiffs also acknowledge that this rule creates a presumption that the moving vessel was negligent, but permits that presumption to be rebutted if the defendant can demonstrate that the moving vessel acted with reasonable care. See Fischer v. S/Y NERAIDA, 508 F.3d 586, 593 (11th Cir. 2007) ("[I]f a ship's owner acted reasonably in preparing for a storm, the owner is not liable even if the ship eventually causes damage to another's property."). "The standard for reasonableness is that of prudent men familiar with the ways and vagaries of the sea." Petition of the United States, 425 F.2d 991, 995 (5th Cir. 1970).[7] Whether an individual exercised the necessary care in a given scenario is a factual finding, which, on appeal, is reviewed only for clear error. See Fischer, 508 F.3d at 596-97 (reviewing district court's determination that reasonable steps were taken for "clear error"). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all cases of the Court of Appeals for the Fifth Circuit handed down prior to October 1, 1981.

12

firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518, 528 (1985) (quotation marks omitted).

The plaintiffs maintain that the district court clearly erred in concluding that Mr. Kreitzberg's preparations were reasonable. At trial, Mr. Kreitzberg testified as to his preparation for the hurricane, including the construction and placement of his mooring. He also testified that, when he checked the position of the ESCAPE three times on the morning of July 10 between approximately nine and twelve, "[e]verything looked fine." R.228 101; see id. at 100-02. Mr. Kreitzberg's seamanship expert testified that the concrete mooring itself "was suited for its purpose," that the method Mr. Kreitzberg used to connect the mooring to the vessel was "totally acceptable" and that Mr. Kreitzberg's placement of the mooring constituted "reasonable seamanship actions." R.227 at 141, 144, 151.

The plaintiffs, however, insist that the district court should not have been persuaded by this evidence in light of the testimony of eye-witnesses that the ESCAPE was dragging its moorings in sustained winds of only 25 to 35 mph. Specifically, in their opening brief to this court, the plaintiffs asserted that, "[a]t approximately 8:30 to 9:00 a.m., about six hours prior to the storm making landfall, Messrs. Finkbone and Braxton observed, and testified to, the *ESCAPE*

13

dragging more than 200 yards from her initial and intended mooring to the west while in the lee of Highway 98." Appellants' Br. 9. In support of this statement, the plaintiffs refer the court to two places in the record. The first reference is to Finkbone's testimony, which states: "Well, basically we thought it interesting that a boat that we observed at 7:00 or 7:30 out there that was moored had moved significantly, 200 yards or so . . . ." R.225 at 44. During cross-examination, however, when confronted with his deposition testimony, Finkbone admits that he previously had testified that he did not "actually see it [the mooring] dragging at any time before [he] took the pictures" and that he "could not tell" whether it was dragging "before, during, or after the taking of these pictures." Id. at 73 (quotation marks omitted).

The second reference does not speak at all to the distance the ESCAPE allegedly had dragged its mooring; instead, it is Braxton's description of the collision of the ESCAPE with a smaller sailboat in the "late morning, 10:30, 11 o'clock," R.226 at 17; he states: "The larger sailboat was further to the north than the east. And this was just right before they were going to hit together. The boat drug down and the stern of the sailboat hit the bow of the small sailboat, damaging it, breaking its lines, and then the small sailboat drifted off. We watched that happen." Id.

14

Contrary to the plaintiffs' assertion, the district court did not ignore this testimony, but simply declined to give it controlling weight.  Neither Finkbone nor Braxton could state affirmatively that, before they lost sight of the ESCAPE at 11:30 a.m., it was dragging its moorings "more than 200 yards" or in sustained winds of only 25 to 35 mph.  The district court, which observed the witnesses at trial, noted this uncertainty in its findings of fact:  "Finkbone testified that . . . he did not actually see it dragging from its mooring because that would be difficult to detect."  Hatt 65, 2009 WL 3163220, at *3.  The district court was in the best position to observe the witnesses and to gauge the relative weight to afford their testimony.  See In re Chalik, 748 F.2d 616, 619 (11th Cir. 1984) (stating that "the trial judge is best able to assess the credibility of the witnesses before him and thus the evidentiary content of their testimony").  After doing so, the district court found Mr. Kreitzberg's testimony, coupled with the opinion of his expert, more persuasive than the plaintiffs' witnesses.  A trial court's decision to credit the plausible testimony of one witness over another, "each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, . . . can virtually never be clear error."  Anderson, 470 U.S. at 575, 105 S. Ct. at

15

1512, 84 L. Ed. at 529-30.[8]

**B.**

The plaintiffs next contend that, because the ESCAPE was in violation of a Florida statute and regulation at the time it allided with the WEJ, the district court should have placed the burden on the ESCAPE to show that the violation was not the cause of the allision, as required by the Pennsylvania rule. See The Pennsylvania, 86 U.S. (19 Wall.) at 136, 22 L. Ed. at 151. Specifically, the plaintiffs maintain that "Florida law clearly states that markers, such as the one attached to Kreitzberg's homemade mooring, must be permitted by divisions of the state commission and the U.S. Coast Guard." Appellants' Br. 29. Because Mr. Kreitzberg did not obtain a permit, he was in violation of Florida law. Consequently, the plaintiffs believe that he was presumptively at fault for the

---

[8] In their brief, the plaintiffs also fault the district court for failing to credit the testimony of a fact witness, Dale Hickman, "that the consistency of the bottom, where he picked [up] the mooring . . . was hardpan sand, not mud." Appellants' Br. 20. Again, however, the court was not required to credit the testimony of Hickman over the testimony of Mr. Kreitzberg with respect to the geological make-up of the surface bottom where Mr. Kreitzberg set his mooring. Compare R.226 at 117 (Hickman testifying that it took "no effort" to get Mr. Kreitzberg's mooring buoy up), with R.228 at 118-21 (Mr. Kreitzberg testifying that, based on his own observations, the area where he placed his mooring buoy had a mud bottom).
    Because we have determined that the district court did not clearly err in determining that Mr. Kreitzberg had acted reasonably in securing his vessel, we need not determine whether the district court was correct in determining that the accident was unavoidable.

16

allision.[9]

Mr. Kreitzberg maintains, however, that the plaintiffs failed to establish the prerequisites for invoking the Pennsylvania rule. He argues that the party relying on the rule must establish a "violation of a statutory rule that is in effect at that time and that is intended to prevent allisions or accidents." Appellees' Br. 27. The district court agreed:

> [T]he rules cited by Hatt 65 require a permit for the placement [of] mooring buoys and markers and reference navigational safety in general. However, there is no indication, either in the rules or statutes cited by Hatt 65, or in any testimony provided, of the purpose of the permit requirement, aside from general references to navigational safety which seem to apply to the markers. The fact that there was no clearly marked or permitted mooring buoy was not the cause of the accident here.

---

[9] The plaintiffs' current argument has altered somewhat from that made to the district court. Before the district court, the plaintiffs argued that the permitting requirements, to which Mr. Kreitzberg was subject, required that "[a]ll mooring buoys must be attached to the waterbody bottom using anchors, sinkers, chain, shackles, swivels, and must be equipped with pennants, that are of sufficient size, strength, and holding power for their intended purpose." R.191 at 4-5 (quotation marks omitted) (emphasis added by plaintiffs). In the plaintiffs' view, the reason for this rule is "to prevent vessels to attempt to utilize moorings that are inadequate for their intended purpose, and thus to preclude the inevitable allision/collision of the drifting vessel in high winds or a low category hurricane." Id. at 5. The district court concluded, however, that the regulation on which the plaintiffs relied was not in effect until 2006--after Hurricane Dennis. With respect to those permit regulations that were in effect, the district court noted that "there is no indication, either in the rules or statutes . . . or in any testimony provided, of the purpose of the permit requirement, aside from general references to navigational safety which seem to apply to the markers. The fact that there was no clearly marked or permitted mooring buoy was not the cause of the accident here." Hatt 65, 2009 WL 3163220, at *10.

Before us, the plaintiffs do not maintain that the district court was incorrect in its determination that the specific mooring requirements were not incorporated into the Florida regulations until after Hurricane Dennis.

Hatt 65, 2009 WL 3163220, at *10.

The facts of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L. Ed. 148 (1874), shed some light on how the rule should be applied. In The Pennsylvania, a steamship, going at undue speed in heavy fog, collided with a bark. The ship's lookout had seen the bark from a distance of approximately three to four hundred yards, which was insufficient time to avoid the collision. The bark, however, had failed to blow her foghorn, as required by the rules of navigation, to alert other vessels that she was approaching. The Court concluded that the bark was at fault and then turned to the question of

> whether the fault contributed to the collision, whether in any degree it was the cause of the vessels coming into a dangerous position. It must be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

The Pennsylvania, 86 U.S. (19 Wall.) at 136, 22 L. Ed. at 151 (emphasis added).

In The Pennsylvania, the navigational rule that was violated--the requirement to alert oncoming vessels by foghorn--was designed to prevent the

18

type of accident--a collision in the fog--that actually occurred. The former Fifth Circuit recognized that, in order for the presumption of The Pennsylvania to apply, there must be some relationship between the navigational rule violated and the harm that occurred: "Appellants would have us give birth to a rule, that every vessel guilty of a statutory fault has the burden of establishing that its fault could not, by any stretch of the imagination, have had a causal relation to the collision, no matter how speculative, improbable or remote. The Pennsylvania does not go that far . . . ." China Union Lines, Ltd. v. A. O. Andersen & Co., 364 F.2d 769, 782 (5th Cir. 1966); see also Parker Towing Co. v. Yazoo River Towing, Inc., 794 F.2d 591, 594 (11th Cir. 1986) ("When both vessels involved in the allision are operating in violation of statutes designed to prevent such mishaps, the rule requires 'the district court to find that the statutory fault of both vessels contributed to the accident'" (quoting Otto Candies, Inc. v. MV Madeline D, 721 F.2d 1034, 1036 (5th Cir. 1983) (emphasis added)). Thus, the burden is on the party invoking the Pennsylvania rule to demonstrate by a preponderance of the evidence that the other vessel was in violation of a statute intended to prevent the type of accident that occurred here--an allision. See Skidmore v. Grueninger, 506 F.2d 716, 722 (5th Cir. 1975) ("It seems clear that in order for a plaintiff to be within The Pennsylvania rule, he must demonstrate by a preponderance of the

19

evidence that a statutory violation has occurred."); see also Folkstone Maritime,

Ltd. v CSX Corp., 64 F.3d 1037, 1047 (7th Cir. 1995) ("For the Pennsylvania Rule

to apply, three elements must exist: (1) proof by a preponderance of evidence of

violation of a statute or regulation that imposes a mandatory duty; (2) the statute or

regulation must involve marine safety or navigation; and (3) the injury suffered

must be of a nature that the statute or regulation was intended to prevent.").

We do not believe that the plaintiffs have met their burden of establishing

that the ESCAPE was in violation of a statute or regulation intended to prevent

allisions at the time it came into contact with the WEJ.  The plaintiffs invite our

attention to section 327.40 of the Florida Statutes[10] and section 68d-23.102 of the

---

[10] The version of section 327.40 of Title XXIV of the Florida Statutes in effect at the time of Hurricane Dennis provided as follows:

327.40.  Uniform waterway markers for safety and navigation; informational markers

(1)  Waterways in Florida which need marking for safety or navigation purposes shall be marked under the United States Aids to Navigation System, 33 C.F.R. part 62.  Until December 31, 2003, channel markers and obstruction markers conforming to the Uniform State Waterway Marking System, 33 C.F.R. subpart 66.10, may continue to be used on waters of this state that are not navigable waters of the United States.

(2)(a)  Application for marking inland lakes and state waters and any navigable waters under concurrent jurisdiction of the Coast Guard and the division shall be made to the division, accompanied by a map locating the approximate placement of markers, a list of the markers to be placed, a statement of the specification of the markers, a statement of the purpose of marking, and the names of persons responsible for the placement and upkeep of such markers.  The division will assist the applicant to secure the proper permission from the Coast Guard where

(continued...)

20

Florida Administrative Code.[11]  These provisions concern the permitting of

_____

[10](...continued)
required, make such investigations as needed, and issue a permit. The division shall furnish the applicant with the information concerning the system adopted and the rules existing for placing and maintaining the markers.  The division shall keep records of all approvals given and counsel with individuals, counties, municipalities, motorboat clubs, or other groups desiring to mark waterways for safety and navigation purposes in Florida.

(b) 1.  No person or municipality, county, or other governmental entity shall place any safety or navigation markers in, on, or over the waters or shores of the state without a permit from the division.

2.  The placement of informational markers, including, but not limited to, markers indicating end of boat ramp, no swimming, swimming area, lake name, trash receptacle, public health notice, or underwater hazard and canal, regulatory, emergency, and special event markers, by counties, municipalities, or other governmental entities on inland lakes and their associated canals are exempt from permitting under this section.  Such markers, excluding swimming area and special event markers, may be no more than 50 feet from the normal shoreline.

(c)  The commission is authorized to adopt rules pursuant to chapter 120 to implement this section.

(3)  The placement of any safety or navigation marker or any informational marker under subparagraph (2)(b)2. on state submerged lands under this section does not subject such lands to the lease requirements of chapter 253.

2005 Fla. Laws 217.

[11]  Florida Administrative Code rule 68D-23.102, which is located in the chapter dedicated to "Uniform Waterway Markers in Florida Waters," provided:

68D-23.102.  Scope.

The provisions of this chapter prescribe the procedures by which the Division permits and regulates the placement of markers in, on, and over the waters of this state and the shores thereof.  This chapter also provides for the design, construction, characteristics and coloring of all markers placed in, on, and over the waters of this state and the shores thereof by adopting by reference the United States Aids to Navigation System, Part 62 of Title 33 of the Code of Federal

(continued...)

navigational markers to ensure the uniform use of markers over the waters of the State.  Nothing in the statute or regulation suggests that these provisions are designed to prevent allisions, much less allisions due to the improper construction or placement of mooring buoys.  Indeed, they are silent as to the placement, size, construction or use of mooring buoys.  Moreover, the plaintiffs have not pointed to any statutory language, or to any administrative or judicial construction of the statute or regulation, that suggests the purpose of these provisions is to prevent allisions generally or to prevent allisions due to inadequate mooring buoys.

Nevertheless, the plaintiffs argue that this court's decision in Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva, 680 F.2d 1374 (11th Cir. 1982), requires that we conclude that Mr. Kreitzberg's failure to obtain a permit triggers application of the Pennsylvania rule.  There are, however, several crucial differences between Orange Beach and the facts of the present case.

In Orange Beach, the plaintiff had sought and obtained a permit from the Army Corps of Engineers for the construction of a submarine water pipeline through the Gulf Intracoastal Waterway near Mobile, Alabama.  The permit

[11](...continued)
Regulations.

Fla. Admin. Code. R. 68D-23.102 (2005).

22

detailed the location, size and clearance of the pipeline. It also required "[t]hat there shall be no unreasonable interference with navigation by the existence" of the pipeline and that signs "facing in each navigational direction" should provide a warning of the pipeline crossing to vessels on the waterway. Id. at 1377 (quotation marks omitted). After the building of the pipeline, erosion occurred, causing "the pipeline [to] become exposed at the points where it originally descended on both the north and the south banks." Id. Moreover, the warning signs were not displayed as required. An unidentified vessel allided with the pipeline as it was attempting to navigate around a tug and barges, which were moored near the pipeline on the opposite side of the waterway. We determined that Orange Beach was negligent by failing to comply with the requirements of the permit and that its negligence contributed to the damage caused by the allision. We noted that 33 U.S.C. § 403[12] prohibits the obstruction to the navigable waters

_____

[12] 33 U.S.C. § 403 is entitled "Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in" and provides:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven,

(continued...)

23

of the United States unless affirmatively authorized by Congress. Although the plaintiff had obtained a permit for its pipeline, the duty imposed by § 403 "is breached where a structure not initially an obstruction to navigation becomes one because of improper maintenance." Id. at 1383. We then concluded:

> The condition of the pipeline on March 29, 1979 clearly constituted an "unreasonable" obstruction to navigation. It is undisputed that vessels with nine foot drafts regularly traveled this portion of the Waterway. Witnesses for both parties testified that empty tows were often required to travel well outside the dredged channel, close to the banks, when passing loaded vessels. The pipeline was struck well into the Waterway, at the depth of 8 to 9 feet, which would correspond to the draft of a tug or a loaded tow. All this happened while Orange Beach was well aware of the potential consequences of failing to maintain the pipeline. Indeed, the injury which occurred was the most obvious consequence.

Id. (emphasis added). We then observed that "[t]he failure to comply with a permit issued by the Corps triggers the application of the rule of The Pennsylvania." Id.

The mere recitation of the facts in Orange Beach should make the distinctions between it and the present case obvious. Orange Beach involved the violation of 33 U.S.C. § 403, which prohibits the obstruction of navigable

---

[12](...continued)
harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

waterways absent authorization, and the mishap that occurred "was the most obvious consequence" of noncompliance. Here, by contrast, there is no clear connection between the statute (or regulation) and the harm that occurred. Furthermore, the permit at issue in Orange Beach detailed every aspect of how the pipeline was supposed to be constructed and maintained; it also explicitly required that the pipeline not unreasonably interfere with navigation. Here, no evidence was offered at all as to what the permitting process entailed, including whether the mooring buoy at issue would meet any requirements set by the State. In sum, Orange Beach does nothing to help plaintiffs establish the prerequisites for invoking the Pennsylvania rule.[13]

---

[13] We do not believe that Sunderland Marine Mutual Insurance Co. v. Weeks Marine Construction Co., 338 F.3d 1276 (11th Cir. 2003), suggests a contrary result. In Sunderland, a tug boat had allided with an unlit barge, which "had used a mooring buoy to anchor . . . in open water, outside Edmont Key's channel." Id. at 1277. The court found that the barge had "violated four safety statutes regarding location, light and sound"; one of these statutes was 33 U.S.C. § 403, which provided that "[a] vessel may not be placed in navigable waters unless a permit is obtained." Id. at 1279. The violations of these statutes, we determined, were sufficient to invoke the Pennsylvania rule and to place the burden on the stationary barge to show that its actions "could not have been a contributory cause of the allision." Id.

As with Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva, the plaintiffs analogize the mooring permit that Mr. Kreitzberg failed to obtain with the permit requirement of § 403. Because the violation of § 403 was a sufficient basis for application of the Pennsylvania rule, the plaintiffs maintain, so should be the permitting requirement under Florida law. As noted in our previous discussion of Orange Beach, however, by its plain language, § 403 is aimed at preventing "obstruction[s]" of navigable waterways that could cause allisions of the very kind that occurred in Sunderland. The plaintiffs failed to come forward with any evidence as to the purpose of the permitting requirement at issue here. Consequently, they did not meet their burden of establishing that the statute or regulation was aimed at preventing allisions.

25

The plaintiffs have not established by a preponderance of the evidence that the ESCAPE was in violation of a statute or regulation intended to prevent allisions. Consequently, the district court did not err when it declined to invoke the Pennsylvania rule.[14]

## Conclusion

The judgment of the district court is affirmed.

**AFFIRMED**

---

[14] Because we affirm the district court's judgment with respect to liability, we need not reach the plaintiffs' contentions regarding the appropriate measure of damages.