**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3173-16T3

IN THE MATTER OF LACEY
TOWNSHIP CAFRA PERMIT.

_____

Argued December 10, 2018 – Decided April 26, 2019

Before Judges Sabatino and Haas.

On appeal from the New Jersey Department of Environmental Protection.

Aaron Kleinbaum argued the cause for appellant Save Barnegat Bay (Eastern Environmental Law Center, attorneys; Aaron Kleinbaum, of counsel; Raghu Murthy, on the briefs).

Lauren R. Staiger argued the cause for respondent Township of Lacey (Gilmore & Monahan, PA, attorneys; Lauren R. Staiger, on the brief).

Jason Brandon Kane, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jason Brandon Kane, on the brief).

PER CURIAM

Appellant Save Barnegat Bay appeals from a decision by the Department of Environmental Protection (DEP) to issue a Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to -21, (CAFRA) permit to the Township of Lacey (Township) to restore and reconstruct Bayfront Park, a Township-owned site that was destroyed by Superstorm Sandy. We affirm.

I.

Bayfront Park (Park) is located on Beach Boulevard in the Township. The Park covers approximately 5.5 acres, and is bordered by Barnegat Bay (Bay) to the east, Forked River to the north, a private beach to the south, and private residential properties to the west. Prior to Superstorm Sandy making landfall in New Jersey on October 29, 2012, the Park was mainly sand. As a result of frequent high-wave action on the shore of the Park, the natural sandy beach eroded over time, sometimes at the rate of three feet per year. In an effort to stem the tide of this erosion, the Township installed "rip-rap"[1] along the perimeter of the shoreline. Residents wishing to access the Bay were able to do so by walking over the rip-rap, or by simply entering the water at either end of the rip-rap.

---

[1] "Rip-rap" is a shore protection structure composed of loose stones and boulders.

Superstorm Sandy dislodged the rip-rap, destroyed a small gazebo, and caused other significant damage to the Park. As a result, the Township applied for, and received, a $1,239,196.75 Community Development Block Grant for Disaster Relief from the New Jersey Economic Development Authority. With these funds, the Township planned to restore the Park so it could again be enjoyed by the public. In order to protect the beach in the future, the Township decided to build a "gabion"[2] wall along the shoreline, and add stormwater management basins at the site. The Township also sought to provide amenities to the public by providing a gazebo, a walking path, a playground area, and an observation deck overlooking the Bay.[3]

In November 2015, the Township applied for a CAFRA Individual Permit for permission to take these shore protection measures and make the improvements described above. During the thirty-day public comment period that followed, DEP received nine written comments, including a nine-page letter

---

[2] A "gabion" is a "shore protection structure that is comprised of wire mesh basket(s) or mattress(es) filled with rock and used in multiples as a structural unit installed to withstand the forces of waves and currents." N.J.A.C. 7:7-1.5.

[3] The Township also proposed providing twenty-six paved parking spaces for Park visitors.

from appellant.[4]  Appellant primarily objected to the installation of the gabion wall in lieu of a "living shoreline" that would not include any structural measures to prevent the erosion of the shoreline.  Appellant also noted that the beach provided habitat for terrapins, birds, and other species.  After submitting this letter, appellant took no further action regarding the Township's permit application while DEP was reviewing it.

Another commenter, Dr. John Wnek, the Research Coordinator of Project Terrapin at the Marine Academy of Technology and Environmental Science, Ocean County Vocational Technical School, recommended that the Township include a "turtle garden"[5] at the site to enhance the nesting habitat for terrapins, and plant sand-tolerant, native vegetation to stabilize the nesting area and protect any terrapin hatchlings.  Unlike appellant, Dr. Wnek continued to work with the Township and DEP as the application proceeded through the review process.

---

[4]  Appellant attached two photographs of a diamondback terrapin to the letter.

[5]  A "turtle garden" is a patch of sandy soil above the high water line that provides a nesting habitat for diamondback terrapins.

A-3173-16T3

Other commenters included homeowners who lived near the Park, as well as a few other area residents.[6] One homeowner voiced her concerns with the proposed development in front of adjacent homes, but emphasized that "the recreational plan for the northern section of the [B]ayfront [P]ark is well-planned and will be an asset to the community." This individual was the only commenter besides Dr. Wnek to express continued interest in the project during the time between the expiration of the public comment period and DEP's final decision on the permit.

At the end of the public comment period, DEP issued a deficiency letter to the Township, citing the application's shortcomings in demonstrating compliance with some CAFRA and stormwater regulations. On April 15, 2016, the Township submitted a revised application addressing each of DEP's concerns.

In the ninety days[7] that followed, DEP staff consulted with Dr. Wnek, the interested Township resident, and the Township's engineering consultants. As

---

[6] The Sierra Club of Ocean County submitted a short e-mail to DEP, and noted that a gabion wall might "cut off" the terrapins' access to the Park beach.

[7] Upon submission of a revised CAFRA individual permit application after public comments are received, DEP has ninety days to issue a decision on the revised application. N.J.A.C. 7:7-26.6(d).

A-3173-16T3

a result, the Township agreed to build a turtle garden in the Park, with thirty-six "turtle transit tunnels" along the entire length of the gabion wall. These tunnels would permit the terrapins to continue to access and nest along the beach and waterfront.

On July 13, 2016, DEP staff issued a thorough written report, recommending approval of the Township's permit application. For the reasons set forth in this report, the staff found that the project complied with all of DEP's applicable regulations, including those governing coastal engineering, N.J.A.C. 7:7-15.11; coastal high hazard areas, N.J.A.C. 7:7-9.18; beaches, N.J.A.C. 7:7-9.22; riparian zones, N.J.A.C. 7:7-9.26; endangered or threatened wildlife or vegetation species habitat, N.J.A.C. 7:7-9.36; and critical wildlife habitats, N.J.A.C. 7:7-9.37. On that same date, DEP approved the permit.

N.J.A.C. 7:7-26.6(g) states that DEP "shall provide notice of the decision on an application for authorization under a . . . CAFRA individual permit in the DEP Bulletin[8 (Bulletin)] and to any person who specifically requested notice of the decision on a particular application." Unfortunately, DEP did not publish notice of its approval of the Township's application in the Bulletin until February

---

[8] DEP publishes the Bulletin on a semi-monthly basis and it contains a list of environmental and construction permit applications recently filed or acted upon by DEP.

6

15, 2017. DEP states in its appellate brief that the delay in publishing the notice was due to an inadvertent oversight.

Although there was a delay in publishing this notice, the permit specifically stated that "any person who is aggrieved by this decision or any of the conditions of this permit may request a hearing within 30 days after notice of the decision is published in the . . . Bulletin." In spite of this, appellant did not request a hearing. Although it thereafter filed a timely notice of appeal, appellant also did not seek a stay of the construction of the shoreline and terrapin protection project, or the Park amenities, from either DEP or this court. Thus, the entire project has already been completed, and the Park reopened to the public in August 2017.

## II.

On appeal, appellant argues that DEP improperly granted the permit because: (1) it should have required the Township to employ a "non-structural" means of protecting the shoreline; (2) the Township's project would "devastate a diamondback terrapin nesting habitat"; (3) the project threatened the habitat of other endangered wildlife; (4) DEP violated the public trust doctrine; and (5) DEP deprived appellant of "due process" by delaying the publication of the permit's approval in the Bulletin. All of these contentions lack merit.

A-3173-16T3

"Established precedents guide our task on appeal.  Our scope of review of an administrative agency's final determination is limited."  Capital Health Sys. v. N.J. Dep't of Banking & Ins., 445 N.J. Super. 522, 535 (App. Div. 2016), (citing In re Stallworth, 208 N.J. 182, 194 (2011)).  We decide only whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole.  In re Taylor, 158 N.J. 644, 656 (1999).  We will not upset the ultimate determination of an agency unless it is shown it was arbitrary, capricious, or unreasonable, or that it violated legislative policies expressed or implied in the statutes governing the agency.  Seigel v. N.J. Dep't of Envtl. Prot., 395 N.J. Super. 604, 613 (App. Div. 2007).

"In reviewing agency action, the fundamental consideration is that a court may not substitute its judgment for the expertise of an agency 'so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.'"  Williams v. Dep't of Human Servs., 116 N.J. 102, 107 (1989) (quoting Dougherty v. Dep't of Human Servs., 91 N.J. 1, 12 (1982)).  Thus, our appellate review does not encompass whether the agency's decision was wise, only whether it was lawful.

> "[J]udicial deference to administrative agencies stems from the recognition that agencies have the

specialized expertise necessary to . . . deal[] with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues . . . .'" "'[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs.'" . . . The court "may not vacate an agency determination because of doubts as to its wisdom or because the record may support more than one result," but is "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs."

[In re Adoption of Amendments to Water Quality Management Plans, 435 N.J. Super. 571, 583-84 (App. Div. 2014) (alterations in original) (citations omitted).]

Where an agency's expertise is a factor, we will defer to that expertise, particularly in cases involving technical matters within the agency's special competence. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 489 (2004). This deference is even stronger when the agency, like DEP, "has been delegated discretion to determine the specialized and technical procedures for its tasks." City of Newark v. Natural Res. Council, 82 N.J. 530, 540 (1980). Moreover,

[w]hen an administrative agency interprets and applies a statute it is charged with administering in a manner that is reasonable, not arbitrary or capricious, and not contrary to the evident purpose of the statute, that interpretation should be upheld, irrespective of how the forum court would interpret the same statute in the absence of regulatory history.

9

[Reck v. Dir., Div. of Taxation, 345 N.J. Super. 443, 448 (App. Div. 2001) (quoting Blecker v. State, 323 N.J. Super. 434, 442 (App. Div. 1999)), aff'd o.b., 175 N.J. 54 (2002).]

Applying these principles, we discern no reason to disturb DEP's decision to grant the permit to the Township.

A.

Contrary to appellant's first contention, DEP did not violate its Coastal Engineering Rule, N.J.A.C. 7:7-15.11, by permitting the Township to use a gabion wall to protect the shoreline. As appellant correctly points out, this regulation establishes a hierarchy in shore protection and storm damage reduction projects. In this hierarchy, DEP prefers that the permit applicant first consider the use of non-structural means of protecting the shore. N.J.A.C. 7:7-15.11(b)(1).

However, if non-structural measures are "not feasible or practicable[,]" the agency's next preference is that the permittee employ a "hybrid" combination of structural and non-structural elements, such as the gabion wall and vegetation

10

measures DEP approved in the present case. N.J.A.C. 7:7-15.11(b)(2).[9] In evaluating whether hybrid shore protection measures may be used instead of entirely non-structural measures, DEP evaluates "the type of waterway on which the site is located, the distance to the navigation channel, the width of waterway, water depth at the toe of bank, the bank orientation, shoreline slope, fetch,[10] erosion rate, the amount of sunlight the site receives, substrate composition, and presence of shellfish habitat." Ibid.

In its revised application, the Township's engineers explained that

> [i]n order to best protect the park with the least amount of disturbance area, the low gabion wall was selected. This methodology provides the best means of wave attenuation, especially towards the narrow, southerly end of the park, closest to the houses. An earthen berm would need to be elevated above the Flood Hazard Area Elevation to be effective. A berm built below the Flood Hazard Elevation would erode in flood events. A berm built above the Flood Hazard Elevation would have roughly a 65 foot wide footprint and be aesthetically unpleasing. A 25 foot wide berm would be required with 5:1 side slopes resulting in a 65 foot footprint. It would also encroach upon the residential properties adjacent to the site since the area

---

[9] If a hybrid combination is neither feasible or practicable, the permittee may exclusively use structural measures to protect the shoreline. N.J.A.C. 7:7-15.11(b)(3).

[10] A "fetch" is the "distance across water that wind blows unimpeded. The greater the fetch, the greater the wind and wave forces." Hatt 65, LLC v. Kreitzberg, 658 F.3d 1243, 1245 n.3 (11th Cir. 2011).

in between the property lines and edge of rip-rap varies from 25 feet to 60 feet. Also, there is no berm to tie into on adjacent properties which would cause erosion and washouts at the ends of the berm.

After considering the Township's expert's findings, DEP reasonably concluded that the non-structural measures, such as the living shoreline now advocated by appellant, were neither feasible nor practicable under N.J.A.C. 7:7-15.11(b)(2). In its comprehensive report, DEP staff noted that the Park was "experiencing significant erosion." Although the staff recognized that "vegetative methods of shoreline stabilization are the preferred methods over structural solutions" under N.J.A.C. 7:7-15.11(b)(1), a hybrid solution was necessary because "[b]ased on information submitted by the [Township's engineers], given the limited beach width, open fetch from the west and recurrent tidal erosional forces, this area is a high energy zone and is subject to highly erosive forces." Moreover, DEP staff found that the Park "has no developed dune system and/or any form of structural protective structure. The lack of protection has led to flooding and damage in past storm events."

Based upon the uncontradicted expert engineering evidence submitted by the Township, and DEP's recognized expertise in this esoteric area, we discern no basis for disturbing DEP's conclusion that the use of solely non-structural

12

shore protection measures was not feasible, and that the hybrid methods chosen

by the Township were both appropriate and necessary.

B.

Appellant's argument that the project would "devastate" a terrapin nesting

habitat also lacks merit.  Pursuant to N.J.A.C. 7:7-9.37(b),

> development that would directly or through secondary
> impacts on the relevant site or in the surrounding region
> adversely affect critical wildlife habitats is
> discouraged,[11] unless: (1) [m]inimal feasible
> interference with the habitat can be demonstrated; (2)
> [t]here is no prudent or feasible alternative location for
> the development; and (3) [t]he proposal includes
> appropriate mitigation measures.

Here, the Township's project clearly includes appropriate mitigation measures

to offset any interference with the terrapin habitat at the Park.

By working with Dr. Wnek, the Township was able to modify the gabion

wall design to provide the terrapins better access to nesting sites by adding

thirty-six "turtle transit tunnels" through the wall.  These tunnels enable the

terrapins to travel from the shoreline to the Park.  The Township also included

---

[11]  "Discouraged" is defined in N.J.A.C. 7:7-1.5 to mean that the proposed
project is "likely to be rejected or denied" unless "mitigating or compensating
measures can be taken so that there is a net gain in quality and quantity of the
coastal resource of concern" and the proposed use is in the public interest.

a "turtle garden" away from the playground and other amenities for the terrapins. To further protect this habitat, DEP imposed seasonal restrictions on any work involving construction equipment along the waterfront, and required the Township to maintain the vegetation in the turtle garden.[12] In addition, Dr. Wnek agreed to consult with the Township throughout the completion of the project.

With these modifications to the Township's original proposal, we are satisfied that DEP properly found that the requirements of N.J.A.C. 7:7-9.37 were met. Therefore, we reject appellant's contrary contention.

C.

Appellant next claims that DEP violated the Endangered or Threatened Species Habitat regulation, N.J.A.C. 7:7-9.36, by allowing development in a

---

[12] On October 15, 2018, we granted appellant's motion to supplement the record on appeal to include information that the Township had mowed some of the vegetation at the Park after June 1, 2018 in violation of the seasonal work restrictions set forth in its permit. On July 26, 2018, DEP issued a notice of violation to the Township for violating this condition. This post-permit violation is not relevant to the present appeal, which involves the question of whether DEP properly issued the permit to restore and protect the Park. DEP addressed the violation appellant brought to our attention and, if appellant was dissatisfied with that resolution, it could have taken action to challenge it. Appellant did not do so.

habitat "essential for survival" of six endangered and threatened bird species. We disagree.

Pursuant to N.J.A.C. 7:7-9.36,

> [d]evelopment of endangered or threatened wildlife or plant species habitat is prohibited unless it can be demonstrated, through an endangered or threatened wildlife or plant species impact assessment, . . . that endangered or threatened wildlife or plant species habitat would not directly or through secondary impacts on the relevant site or in the surrounding area be adversely affected.

During its review of the Township's application, DEP staff determined that the State's Landscape Maps[13] identified six endangered and threatened species which may live in Ocean County, including the Bald Eagle, Northern Harrier, Osprey, Black Skimmer, Roseate Tern, and Black-Crowned Night Heron.

However, after reviewing these maps, and documentation submitted by the Township, DEP staff found that the "proposed work locations do not feature suitable State- or Federally-listed threatened or endangered species habitat." In addition, the staff concluded that "no adverse impact to suitable open water habitat that occurs for protected avian species foraging along Barnegat Bay is

---

[13] The New Jersey Division of Fish and Wildlife's Endangered and Nongame Species Program is responsible for documenting imperiled species and their habitats in New Jersey by preparing these Landscape Maps.

A-3173-16T3

anticipated through the proposed project."  DEP staff's findings are fully supported by the record developed during the permit review process.  Therefore, we discern no principled basis on this record for disturbing DEP's determination that the application complied with N.J.A.C. 7:7-9.36.

D.

We also disagree with appellant's contention that DEP violated the "public trust doctrine" by permitting the Township to "cut off" the public's access to the Bay by building a gabion wall to protect the Park's shoreline from erosion.  The public trust doctrine "derives from the ancient principle of English law that land covered by tidal waters belonged to the sovereign, but for the common use of all the people."  Borough of Neptune City v. Borough of Avon-By-The-Sea, 61 N.J. 296, 303 (1972); see also Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 312 (1984) (noting that "[t]he public trust doctrine acknowledges that the ownership, dominion and sovereignty over land flowed by tidal waters, which extend to the mean high water mark, is vested in the State in trust for the people").

DEP codified these principles in N.J.A.C. 7:7-16.9(a) which, in pertinent part, states:

> [p]ublic access to the waterfront is the ability of the
> public to pass physically and visually to, from, and

along tidal waterways and their shores and to use such shores, waterfronts and waters for activities such as navigation, fishing, and recreational activities including, but not limited to, swimming, sunbathing, surfing, sport diving, bird watching, walking, and boating.

However, "no public access is required if there is no existing public access onsite[,]" but "[a]ny existing public access shall be maintained or equivalent onsite public access shall be provided." N.J.A.C. 7:7-16.9(k)(3)(i).

Contrary to appellant's contention, DEP's approval of the gabion wall did not violate the public trust doctrine or N.J.A.C. 7:7-16.9. Before Superstorm Sandy destroyed the Park, it was mainly sand, with rip-rap imperfectly protecting the shore. The Township did not fund any specific access route to the Bay, but residents could walk over the rip-rap to get into the water.

The construction of the gabion wall did not deprive the public of access to the Bay any more than the rip-rap previously had. Indeed, the public can walk on top of the gabion wall along the shoreline, and step off of it into the Bay at any point because the top of the wall is no more than two feet above the surface of the water. Because the public has the same access to the Bay that it had before

17

Superstorm Sandy,[14] we conclude that DEP fully complied with the public trust regulation, N.J.A.C. 7:7-16.9.

It is also important to note that the restored Park now provides increased public access to the Bay through the addition of a walking path, recreational activities, a playground, and a small parking lot. The shoreline is also better protected. Thus, the present factual circumstances are plainly distinguishable from the cases appellant relies upon to claim that the construction of a gabion wall, which citizens can walk along as they access the Bay, violates the public trust doctrine. See Van Ness v. Borough of Deal, 78 N.J. 174, 180 (1978) (barring a municipality from roping off an area of beach in front of a casino and reserving it for the use of casino members only); Borough of Neptune City, 61 N.J. at 298, 310 (striking a financial barrier to public water access); Matthews, 238 N.J. Super. at 312, 332 (voiding a regulation prohibiting public water access).

---

[14] In addition, the public continues to have the option, as it did while there was only rip-rap at the shoreline, of accessing the Bay by walking around the wall and rip-rap to the northern and southern boundaries of the Park to enter the water.

E.

Finally, appellant argues that DEP "violated its constitutional due process obligations" by failing to publish notice of its July 13, 2016 approval of the Township's permit until February 15, 2017, when it appeared in the Bulletin. Again, we disagree.

The record does not disclose a specific explanation for the delayed publication of the approval of the permit, although DEP has stated that it was caused by an inadvertent oversight.[15] Regardless of the reason for the delay, however, it is clear that appellant suffered absolutely no prejudice as a result of it.

DEP published notice of the filing of the Township's application in the Bulletin, and thereafter provided a thirty-day public comment period. During the comment period, appellant submitted a letter in opposition to the proposed project. Unlike several other commenters, appellant then took no further action prior to the permit's approval. When it was issued, the permit specifically stated that "any person who is aggrieved by this decision or any of the conditions of

---

[15] In its appellate brief, appellant speculates that DEP may have delayed publishing notice of the approval of the permit so the public would lose interest in it, thereby ensuring there would be less opposition to any decision to grant the permit. However, nothing in the record supports this assertion.

A-3173-16T3

this permit may request a hearing within 30 days after notice of the decision is published in the DEP Bulletin." Thus, appellant had thirty days after the publication of the February 15, 2017 Bulletin to request a hearing. It did not do so.[16]

Because DEP provided notice to appellant of the filing of the application, allowed appellant to submit written comments addressing the application, and afforded appellant the right to request a hearing, DEP provided appellant with all of the process due it under the circumstances of this case.

### F.

In sum, we conclude that DEP's decision to approve the Township's application for a CAFRA permit to restore and protect the Park for the public's use was neither arbitrary, capricious, or unreasonable. DEP followed all of the governing regulatory policies, and its findings supporting its approval of the project are fully supported by the administrative record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[16] As previously noted, appellant also had the opportunity to seek a stay of construction pending appeal from DEP and this court. However, it did not pursue this remedy.

A-3173-16T3